ESTATE OF HOWARD H. STRAUGHN, DECEASED, IRIS STRAUGHN, EXECUTRIX, AND IRIS STRAUGHN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4615–68. Filed October 7, 1970.

*George F. Belyea* and *Timothy R. Nibler*, for the petitioners.
*Richard D. Worsley*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' Federal income tax for 1964 and 1965 in the amounts of $15,561.34 and $2,049.04, respectively. Certain concessions have been made by both parties, and the only issue remaining for decision is whether the expenditures incurred by Howard Straughn for the subsoiling and leveling of land which he acquired in 1964 are deductible as soil or water conservation expenditures under section 175.[1]

### FINDINGS OF FACT

Iris Straughn (hereinafter referred to as petitioner) was a legal resident of Visalia, Calif., at the time the petition was filed. Howard H. Straughn (hereinafter referred to as Straughn) was also then a legal resident of Visalia, Calif.; however, he died on July 27, 1969, and on August 29, 1969, petitioner was appointed executrix of his estate. Petitioner and Straughn filed their joint Federal income tax returns for 1964 and 1965 with the district director of internal revenue, San Francisco, Calif.

On April 7, 1964, Straughn and petitioner, as part of a multiple escrow arrangement, entered into a real property exchange agreement

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

with Eldon L. Adams (hereinafter referred to as Adams) and Jessie Marie Adams, husband and wife. As a result of the exchange, Straughn acquired from Adams 170 acres of land (hereinafter referred to as the Adams land) in Tulare County, Calif. This land was adjacent to approximately 130 acres already owned by Straughn.

The Adams land is of the San Joaquin soil series, an old terrace type of soil having hardpan below the surface. The hardpan, a product of chemical reactions which have occurred over thousands of years, is a layer of soil which has become heavily compacted and very hard, resembling cement. The hardpan impedes the root growth of most plants and obstructs the penetration of irrigation or rainwater. Varying in thickness from about 2 inches to 2 or 3 feet, the hardpan is found below the surface of the land at various depths from 8 inches to 3 feet. The surface of the land in which hardpan is located consists of mounds and depressions, resulting in a natural undulating surface configuration.

Adams had actively farmed the Adams land for 55 years prior to the conveyance to Straughn. During the 15 years immediately preceding the conveyance, Adams wet-farmed the land with irrigation water applied through a sprinkler system. During the period of wet-farming, Adams employed a summer fallow crop rotation method of farming. Under this method every portion of the land at one time or another was planted to cotton or wheat or was left fallow. At the time of Straughn's acquisition, Adams had cotton and wheat crops growing on part of the land. In the real property exchange agreement, Adams reserved the right, rent free, to use and occupy the land upon which a crop was planted until such crop was harvested. Under this reservation, he harvested the wheat from the middle 80 acres during July and August 1964 and the cotton from the northernmost 25 acres in January 1965.

Straughn had been growing Emperor table grapes on the 130 acres adjacent to the Adams land during 1963, 1964, and 1965. He continued this same use of his 130 acres after he acquired the Adams land.

Upon completing the acquisition, Straughn wished to change the crops on the Adams land from wheat and cotton to Emperor table grapes. In order to economically produce this type of grapes, the land needed to be subsoiled and leveled. Since the roots of the grapevines could not penetrate the hardpan, subsoiling was required to permit them to develop the most favorable root structure. Also, Emperor table grapes will not tolerate irrigation by sprinkling; if water falls on the grapes during the ripening process, they will crack and are likely to become infected with fungus diseases. Accordingly, it was

necessary to level the land in order to permit the grapevines to be irrigated by surface methods.

The subsoiling and leveling processes are closely related. The subsoiling operation consists of ripping the hardpan with the shanks of heavy plows and chisels drawn by tractors until it is broken up and pulverized. The land is then leveled and, as a general rule, is immediately irrigated. As a result of the irrigation, the soil usually settles in the areas where depressions have been filled, and a re-leveling process is required. Once it has been broken up, the hardpan will not re-form.

The subsoiling and leveling processes are beneficial in several respects. The destruction of the hardpan allows irrigation and rainwater to sink deeper into the soil, and permits the development of better root structures by cotton, wheat, and other plants, as well as grapevines. Since the leveled land can be irrigated by surface methods as well as through sprinkler systems, the land is adaptable for use in growing a wider variety of crops. The problems created by the accumulation of irrigation water in the depressed areas are eliminated. These processes are common practices in the San Joaquin Valley; indeed, virtually all cotton, as well as grapes, is grown on land which has been leveled and subsoiled.

During September, October, and November 1964, after Adams had harvested his wheat crop, Straughn subsoiled and leveled the southernmost 65 acres which had been lying fallow, and the middle 80 acres which had been planted in wheat. The northernmost 25 acres, from which Adams did not harvest his cotton crop until January 1965, were subsoiled and leveled during March and April of that year. Following the subsoiling and leveling of this last 25 acres, Straughn planted the entire 170 acres in Emperor table grapes.

The amounts expended by Straughn for the subsoiling and leveling are allocable to the several procedures involved therein as follows:

| | | |
|---|---|---|
| (a) Subsoiling | | $8,000 |
| (b) Cross-chiseling | | 4,000 |
| (c) Leveling and earth-moving | | 11,209 |
| (d) Land planning and floating | | 2,500 |
| | Total | 25,709 |

Straughn and petitioner claimed deductions for these expenses in their Federal income tax returns for 1964 and 1965. In the notice of deficiency, respondent determined that the sums spent during 1964 and 1965 for subsoiling and leveling were capital expenditures and not allowable deductions.

OPINION

Petitioner relies upon section 175 to support her election to expense rather than to capitalize the cost of subsoiling and leveling the Adams land. The section is, in part, as follows:

(a) IN GENERAL.—A taxpayer engaged in the business of farming may treat expenditures which are paid or incurred by him during the taxable year for the purpose of soil or water conservation in respect of land used in farming * * * as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.

Expressly or implicitly conceding that petitioner meets all other requirements of section 175, respondent seeks to deny the claimed deductions on the theory that the expenses for leveling and subsoiling were not incurred in respect of "land used in farming" as defined by section 175(c)(2) and section 1.175–4(a)(2), Income Tax Regs.

Section 175(c)(2) defines the phrase "land used in farming" in these words:

The term "land used in farming" means land used (before or simultaneously with the expenditures described in paragraph (1)) by the taxpayer or his tenant for the production of crops, fruits, or other agricultural products or for the sustenance of livestock.

Section 1.175–4(a)(2), *supra*, amplifies the statutory definition, in relevant part, as follows:

If the expenditures [for soil or water conservation] are made by the taxpayer in respect of land newly acquired from one who immediately prior to the acquisition was using it in farming, the taxpayer will be considered to be using the land in farming at the time that such expenditures are made, if the use which is made by the taxpayer of the land from the time of its acquisition by him is substantially a continuation of the use which was made of the land immediately prior to its acquisition. On the other hand, if the land is being initially prepared by the taxpayer in order to make it suitable for a particular farming use other than the one to which the land was devoted prior to its acquisition by the taxpayer, such land is not considered to be "land used in farming" at the time of its preparation.

The only question is whether the Adams land was "land used in farming * * * before or simultaneously with" the subsoiling and leveling operations; more specifically, whether Straughn's use of the Adams land was "substantially a continuation of the use" which had been made of it by the prior owner.[2] We hold that it was.

---

[2] In her reply brief, petitioner challenges the validity of the above-quoted sentences from sec. 1.175–4(a)(2), Income Tax Regs. The relationship between these sentences and sec. 175(c)(2) is not entirely clear, and respondent has given us no clue as to how they serve the purposes of sec. 175. Cf. Comment, "Secs. 175 and 182: Farmer Deductions for Capital Improvements to Land," 19 Hastings L.J. 446, 450–451 (1968). In view of our conclusion that Straughn's use of the land qualifies petitioner to make the disputed election, we express no opinion on the validity of the challenged portion of the regulations.

Section 175 was first adopted as part of the 1954 Code. The testimony at the hearings [3] on the bill finally enacted indicates that the legislative purpose of the section was to encourage sound land and water conservation practices by permitting farmers, subject to prescribed limitations, to expense rather than capitalize outlays for this purpose. The Congress was evidently convinced that, in view of the importance of maintaining agricultural productivity, the public interest was served by allowing this special tax benefit. The legislative history of this section, however, provides no criteria for determining, in the case of newly acquired land, the meaning of the phrase "substantially a continuation of the use which was made of the land immediately prior to its acquisition," contained in the regulation.

In the language of both section 175 and the disputed regulation, however, the key word is "use" or "used." The structure of section 175 suggests that the drafters conceived of two general types of land use—land used "for the production of crops, fruits, or other agricultural products" [4] and land used "for the sustenance of livestock." By preceding each general category with the word "for" rather than using it at the beginning of the list or before each item, the drafters seem to have conceived of "land used in farming" as encompassing these two general types of use.[5]

Three examples are given in section 1.175–4 [6] of the regulations to illustrate the meaning of "land used in farming"; they refer to newly

---

[3] Hearings before the House Committee on Ways and Means on Forty Topics Pertaining to the General Revision of the Internal Revenue Code (Part 2), 83d Cong., 1st Sess., pp. 921–959 ; Hearings before the Senate Committee on Finance on H.R. 8300, an Act to Revise the Internal Revenue Laws of the United States (Part 4), 83d Cong., 2d Sess., pp. 2114, 2345–2348 (1954).

[4] In our view the term "crops" as used in sec. 175(c)(2) includes not only those products of the soil such as corn, wheat, and similar items which must be planted and harvested each year, but also fruits and berries and similar products which need not be planted but are harvested annually. We recognize that grapes may be classified as a fruit as well as a crop ; however, since both fruits and crops are "agricultural products," we think the phrase "crops, fruits, or other agricultural products" was employed in sec. 175(c)(2) only to make certain that the statutory language was all inclusive, not to attempt to distinguish between fruits and other crops.

[5] The committee reports accompanying the 1954 Code also employ "for" to introduce each phrase describing these two types of uses in the same manner. H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess., pp. 28–29 (1954) ; S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d sess., pp. 33–34, 216–218 (1954).

[6] Example (1). A purchases an operating farm from B in the autumn after B has harvested his crops. At the time of such purchase the land is suitable for A's particular farming use without the necessity of making initial preparatory expenditures. Prior to spring plowing and planting when the land is idle because of the season, A makes certain soil and water conservation expenditures on this farm. At the time such expenditures are made the land is considered to be used by A in farming, and A may deduct such expenditures under section 175, subject to the other requisite conditions of such section.

Example (2). C acquires uncultivated land which he intends to develop for farming. Prior to putting this land into production it is necessary for C to clear brush, construct earthen terraces and ponds, and make other soil and water conservation expenditures.

acquired land, and appear to maintain these two classifications. Example (1) involves the situation where A purchases a farm and incurs soil and water conservation expenses before planting his first crop, and such expenses are deductible. The point of the illustration appears to be that, at the time of the acquisition, the farm was an "operating" one, suitable for A's particular farming use, i.e., growing crops. Example (2) is the converse of Example (1) ; C purchases "uncultivated" land which he intends to develop for farming, and the soil and water conservation expenses which he incurred prior to putting the land into production are not deductible.[7] Example (3) illustrates the situation where land used for grazing (i.e., "for the sustenance of livestock") is purchased and converted to use for a citrus grove (i.e., "for the production of crops, fruits, or other agricultural products") ; expenditures required to make this conversion are not deductible.

In any event, even if, for the purposes of section 175(c)(2), more specific land uses were contemplated, we find no basis for the fine distinction which respondent seeks to make between the use of land for growing crops of wheat or cotton and the use of land for growing crops of grapes. Respondent cites no authority to support it, and nothing in the language of section 175, its legislative history, or the regulations suggests a congressional intent to allow the election where the land is used for one crop but not where it is used for another. In the present case, the Adams land had been used for the growing of crops—wheat and cotton—for some 15 years. Upon acquiring the land, Straughn planned to, and did, use it for growing a crop—grapes. We think this is "substantially a continuation of the use which was made of the land immediately prior to its acquisition" within the meaning of of the regulation.

Respondent argues that the subsoiling and leveling operations were necessary in order to prepare the land for use in growing Emperor table grapes, and that this fact alone shows that Straughn did not continue substantially the same use of the land as the former owner. We do not agree. These operations resulted in permanent improve-

The land is not used in farming at the same time that such expenditures are made. Therefore, C may not deduct such expenditures under section 175.

Example (3). D acquires several tracts of land from persons who had used such land for grazing cattle. D intends to use the land for a citrus grove. In order to make the land suitable for this use, D constructs earthen terraces, builds drainage ditches and irrigation ditches, extensively treats the soil, and makes other soil and water conservation expenditures. The land is not used in farming by D at the time he makes such expenditures, but is being initially prepared for use as a citrus grove. Therefore, D may not deduct such expenditures under section 175.

[7] Under sec. 182(c)(1), a taxpayer engaged in the business of farming may elect to deduct certain expenses incurred in clearing land—for "the eradication of trees, stumps, and brush, the treatment or moving of earth, and the diversion of streams and watercourses"—subject to limitations on the deductible amounts different from those set forth in sec. 175 ; accordingly, the two sections appear to be mutually exclusive. Sec. 1.182–3 (b)(2), Income Tax Regs.

ments to the land, for neither the hardpan nor the mounds and depressions will re-form. Furthermore, the benefits of these conservation measures are not limited simply to the growing of grapes—they aid many crops. Breaking up the hardpan permits irrigation and rainwater to sink deeper into the soil and allows growing plants to develop better root structures. In addition, level land can be irrigated by surface methods as well as a sprinkler system; as a result, the land can be used for a wider variety of crops. Significantly, less than 5 percent of the cotton land in Tulare County, for example, has not been leveled. In view of these general and permanent improvements, we do not think the deductions can be denied merely because the disputed expenses were beneficial for the grape crop.

Had Straughn planted the Adams land to wheat or cotton immediately after leveling and subsoiling it, there would have been no basis for denying the disputed deductions on the ground that substantially the same use of the land was not continued. The same would be true if he had planted the grapes immediately after harvesting a single cotton or wheat crop. No good reason has been shown why a different result should follow merely because he did not first plant the land to wheat or cotton and then to grapes but, instead, immediately planted it to grapes. We find nothing in the language or purposes of section 175 to justify the fine distinction which respondent advocates.

Respondent emphasizes the extensiveness of the soil and water conservation measures undertaken by Straughn as evidence that he did not continue to use the land for substantially the same purpose. We find this argument faulty. In *Eidson, Jr.* v. *United States*, an unreported case (W.D. Tex. 1961, 8 A.F.T.R.2d 5495, 61–2 U.S.T.C. par. 9668), reversed on other issues 310 F.2d 111 (C.A. 5, 1962), the taxpayer was allowed to expense the costs of a conservation program involving the planting of newly acquired grazing land to crops for a 5-year period in order to increase the humus in the soil and thereby improve its ultimate productivity for pasture purposes. Cf. also *Rita Behring*, 32 T.C. 1256 (1959).[8] Moreover, the Congress recognized that substantial soil or water conservation expenditures might be deductible under the section by incorporating therein subsection (b), which limits the amount of the deduction to "25 percent of the [taxpayer's] gross income derived from farming during the taxable year," subject to carryover provisions.

We hold that petitioner's expenses for subsoiling and leveling the Adams land are deductible under section 175.

*Decision will be entered under Rule 50.*

---

[8] The other cases which have discussed sec. 1.175–4, *supra*, do not, we believe, shed any light on the particular issue presented in this case. See *Herndon* v. *United States*, 203 F. Supp. 536 (E.D.S.C. 1962) ; *Winfield A. Coffin*, 41 T.C. 83 (1963).