**A. DUDA & SONS, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 69–228–Orl–Civ.**

United States District Court,
M. D. Florida,
Orlando Division.

Oct. 21, 1974.

Robert H. Kennedy and William H. Lutz, Jr., Cleveland, Ohio, for plaintiff.

John L. Briggs, U. S. Atty., in Jacksonville, Fla., and Helen E. Marmoll, Tax Div., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND ORDER

TJOFLAT, District Judge.

This action is an income tax refund suit brought by the taxpayer, A. Duda & Sons, Inc. (Duda) to recover certain taxes and interest paid for the fiscal years 1962 through 1965. Duda is a family-owned corporation engaged in farming and ranching operations in Florida. On its tax returns for the fiscal years in question it claimed substantial deductions for soil and water conservation expenses and for soil depletion on certain farms. Duda also reported as capital gains the income from the sale of certain Brahman cattle. Upon audit the Commissioner disallowed the deductions and held that the proceeds from the cattle sales should be taxed as ordinary income. Duda paid the taxes assessed and interest thereon and brought this suit for refund. This Court has jurisdiction of the matter pursuant to Title 28, United States Code, Section 1346(a)(1).

The trial of this case commenced before a jury on all issues. At the close of the evidence, however, the parties stipulated that the soil and water conservation expenditure issue be withdrawn from the jury and decided by the Court.

The soil depletion and cattle issues were submitted to the jury in the form of special interrogatories. Also submitted to the jury was Duda's claim for some additional expenses, which, through alleged oversight, it had neglected to deduct in 1964 and 1965. These latter issues are presently before the Court on the taxpayer's alternative motions for judgment notwithstanding the jury verdict, a new trial, and for partial correction of the jury's response to the special interrogatories concerning soil depletion. They will be discussed following the Court's resolution of the merits of the soil and water conservation expenditures.

## SOIL AND WATER CONSERVATION EXPENDITURES

During the years in issue, Duda owned and operated various farms throughout the State of Florida, including ones located near Belle Glade, Sun City, La Belle and Zellwood. During those years Duda expended substantial sums at each of these locations for soil and water control purposes. The amounts expended were deducted by the taxpayer on its federal income tax returns as allowable expenses under Section 175, Internal Revenue Code of 1954.[1] There was no substantial dispute between the parties as to the dollar amounts expended by Duda or, with the possible exception of the La Belle farm, that the expenditures were "for the purpose of soil or water conservation" within the meaning of Section 175. The question to be decided is whether the expenditures for soil and water conservation were made "in respect of land used in farming" within the meaning of Section 175 and the applicable regulations.[2]

The Belle Glade farm comprises approximately 15,000 acres, roughly half of which are owned by Duda, with the remainder being leased. The farm is divided into units for cost control and planting purposes. Each unit is typically rectangular in shape and approximately 320 acres in size. Duda's practice was to develop these units in blocks of four, consistent with the location of irrigation and drainage canals. At no time during the years in dispute was all the acreage at Belle Glade under actual cultivation.

1. (a) IN GENERAL.—A taxpayer engaged in the business of farming may treat expenditures which are paid or incurred by him during the taxable year for the purpose of soil or water conservation in respect of land used in farming, or for the prevention of erosion of land used in farming, as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction. 26 U.S.C. § 175(a).

2. Treas.Regs. § 175-4, entitled "Definition of 'land used in farming,'" provides in part,

(a) For the purpose of section 175, the term 'land used in farming' means land which is used in the business of farming and which meets both of the following requirements:

(1) The land must be used for the production of crops, fruits, or other agricultural products, including fish, or for the sustenance of livestock. The term 'livestock' includes cattle, hogs, horses, mules, donkeys, sheep, goats, captive fur-bearing animals, chickens, turkeys, pigeons, and other poultry. Land used for the sustenance of livestock includes land used for grazing such livestock.

(2) The land must be or have been so used either by the taxpayer or his tenant at some time before, or at the same time as, the taxpayer makes the expenditures for soil or water conservation or for the prevention of the erosion of land. The taxpayer will be considered to have used the land in farming before making such expenditures if he or his tenant has employed the land in a farming use in the past. If the expenditures are made by the taxpayer in respect of land newly acquired from one who immediately prior to the acquisition was using it in farming, the taxpayer will be considered to be using the land in farming at the time that such expenditures are made, if the use which is made by the taxpayer of the land from the time of its acquisition by him is substantially a continuation of the use which was made of the land immediately prior to its acquisition. On the other hand, if the land is being initially prepared by the taxpayer in order to make it suitable for a particular farming use other than the one to which the land was devoted prior to its acquisition by the taxpayer, such land is not considered to be 'land used in farming' at the time of its preparation."

The taxpayer's initial contention was that the entire 15,000 acres should be considered as a single farming entity so that any one unit of the farm would qualify as "land used in farming" under Section 175 whether or not the individual unit was actually under cultivation. It was the taxpayer's position that cultivating extensive portions of the farm qualified additional adjacent segments or units developed in blocks as land used in farming before development of the adjacent units began. This "entity" theory advanced by the taxpayer was rejected by the Court during the trial, and this Court ruled that to qualify for Section 175 treatment the land in question must actually be used in farming. The mere proximity of land to other units under cultivation is not sufficient to make it come within the definition of land used in farming. The parties stipulated that this issue—whether the units in question qualified as "land used in farming" at the time of the disputed expenditures—be withdrawn from the jury and decided by the Court.

In dispute at the Belle Glade farm is $41,601.15, the amount expended on units designated I through M, O through R, and SA through SD, during the fiscal years 1962, 1963, and 1964. All of the expenditures occurred after the first farming activity on the unit involved, and the land had been owned by Duda for a number of years. None of the land had been previously cultivated by Duda.

A Section 175 deduction cannot be taken unless the taxpayer is using the land for the production of crops or for the sustenance of livestock at the time the expenditure is made. In the case of land not already under cultivation the question is whether the field in question is still being prepared for farming use or has been transferred to land actually used in farming. The answer turns upon consideration of several factors. Among them are the type and number of crops planted, growing seasons and weather conditions. Market conditions and good farming and crop management practices should also be considered. The Court concludes that, in order for soil and water conservation expenditures on a particular unit to be deductible, at the time the expenditures are made the unit must be substantially ready and capable of immediately receiving the planting of marketable crops, and the unit must in fact be used for farming purposes within a reasonable time after the expenditure.

With respect to the Belle Glade farm, on Unit I, for example, the first planting took place between October 16 and October 30, 1961, and consisted of 76 acres of cabbage. From October 24 to November 21, 25½ acres of Chinese cabbage were planted, and 182 acres of sugar cane went in between December 1 and December 13. The final planting, 105½ acres of sweet corn, occurred between February 2 and March 12, 1962. In sum, approximately 389 acres of Unit I were subjected to fairly continuous planting activity over a period of five months. The Court finds that this unit was ready and capable of receiving crops in its entirety at the time of the expenditures and was substantially farmed within a reasonable period thereafter. Under the rule formulated by this Court the Government no longer contests the deductions with respect to any of the other Belle Glade units except Unit L. Duda, on the other hand, has abandoned its claim that the Unit L expenditures are deductible. Only 69¼ acres of that unit were planted in less than a month of fiscal year 1962, and the entire unit clearly cannot qualify as land used in farming. With the exception of that unit, all the units at Belle Glade are entitled to Section 175 treatment as land used in farming.

The Sun City farm of 560 acres was acquired by Duda in 1962. At that time, 260 acres were planted in Gladioli, 120 acres in grass sod, and 55 acres in citrus. The entire farm had previously been planted in tomatoes. Shortly after the purchase, Duda started planting orange trees and, simultaneously, began improving the irrigation and drainage

system on the farm. Eventually the entire farm was planted in citrus.

■ Sun City was a newly acquired farm at the time of the disputed expenditures. Such land may qualify as "land used in farming" only if the taxpayer's utilization of the land is "substantially a continuation of the use which has been made of the land immediately prior to its acquisition." If the taxpayer puts the land to a farming use different from that of the prior owner, the land is not considered to be "land used in farming." Treas.Reg. § 1.175.4(a)(2).

The Government contends that *any* change in farming use is sufficient to deny the Section 175 deduction. Thus, a vegetable farmer, buying land from another vegetable farmer, could not deduct soil and water conservation expenditures if he planted a different vegetable. It is the opinion of this Court that such an interpretation of the statute is unrealistic and could well discourage good farming practice.

■ The statute and the regulations suggest two *general* types of farming uses: (1) the production of crops, fruits and other agricultural products; and (2) the sustenance of livestock. The taxpayer contends that a substantial continuation of the prior use is effected if the new owner practices the same general type of farming as his predecessor. This approach appears reasonable and has been adopted by the Tax Court. Estate of Howard H. Straughn, 55 T.C. 21 (1970). In this Court's opinion this interpretation of "substantial continuation" in this context is the correct one. Applying that interpretation the Court finds that a substantial continuation of the prior use was obtained at Sun City, and, accordingly, Duda is entitled to the claimed refund.

The La Belle farm consists of approximately 27,500 acres purchased principally in 1962 and 1963 from Asa Townsend (4,600 acres), Turner Lumber Company (1,900 acres) and the Wellhouse Estate (20,000 acres). The evidence established that, before the purchase, the

Townsend Tract had tomatoes, watermelons, and various other crops, 175 acres of citrus, and 1,100 head of cattle. Duda maintained the citrus operation and cattle continued to run on the remainder of the tract. Cattle also grazed on the Turner and Wellhouse Tracts as they had before the acquisitions. Duda's utilization of the land was clearly a substantial continuation of the prior use.

■ Approximately a year after the purchase of the Townsend tract plaintiff expended substantial sums to deepen and widen the Townsend canal and to improve irrigation and drainage throughout the La Belle farm. Although it concedes that the land was used in farming, the Government urges that the expenditures were incurred not for soil and water conservation but, rather, to convert the land to a different farming use. The Government contends that, at the time of purchase, Duda had a "plan" to develop a large citrus grove. Duda admits planning to use the La Belle farm one-third for cattle, one-third for vegetables, and one-third for citrus. The Court is not prepared to hold that such a plan runs afoul of the requirements of Section 175 as a matter of law. It is not indicated under the Government's theory when the "plan" must succeed or fail or when, in point of time, its initiation does or does not operate to deny the taxpayer the deductions. The La Belle farm was unquestionably "land used in farming" and the expenditures were unquestionably made for soil and water conservation and to support vegetable and citrus farming and the grazing of cattle. The law requires no more.

Since at the close of the evidence there was no dispute over the use of the land or the physical nature of activities for which expenditures were made, the parties agreed to submit this issue to the Court. For the reasons stated, the taxpayer was entitled to deduct these La Belle Farm expenditures.

The Zellwood Farm consists of 3,918 acres which Duda has been farming since 1943. The principal crops included

celery, cabbage, corn, escarole and similar vegetables. In much the same manner as the Belle Glade farm the Zellwood farm was divided into units. As of August, 1963, approximately 2,400 acres were under cultivation for the production of celery and other crops as above. At that time, the easterly portion of the farm, in particular units designated J and K, had not been cultivated by Duda. The uncultivated portion was swampy land overgrown with saw grass and willow trees. About October of 1963 Duda commenced clearing and preparing Unit J for growing crops and about January of 1964 commenced similar work on Unit K. The expenditures in question were incurred in digging canals and ditches and building dikes on Units J and K. All such expenditures were made before the first farming activity took place on the units involved. It is the opinion of this Court, and taxpayer conceded at trial, that only if the Court accepted the "entity" theory advanced by the taxpayer could it prevail with respect to the expenditures on the Zellwood farm. That theory having been rejected, the taxpayer is entitled to no refund with respect to the deductions disallowed for the Zellwood Farm expenditures.

## THE CATTLE ISSUE

During the years in question, 1962 through 1965, the taxpayer maintained a large beef cattle operation consisting of a commercial herd numbering between 12,000 in 1962 and 17,000 in 1965, and a purebred herd of roughly 1,600 to 1,700 animals. The purpose of the commercial herd was to produce cattle to be raised for sale as beef. The purebred herd was maintained separate and apart from the commercial herd and cattle produced from that herd are either retained for the purebred herd, put into the commercial herd to increase the quality of the beef operation, or culled as unsuitable breeding animals.

Each Brahman calf is weighed and graded at the end of four months, at eight months (weaning time), and again between the age of fourteen and twenty months. The quality of the purebred herd is maintained by culling out those animals which do not meet certain objective standards established for deciding which animals do not qualify for retention. Some of those culled are sold directly to the slaughterhouse, but many are sold as breeders to other ranchers.

Taxpayer's position is that these animals, until culled, are held primarily for breeding purposes and are therefore entitled to capital gains treatment as sales of property used in the trade or business pursuant to Section 1231 of the Internal Revenue Code.[3] The Government contends that the taxpayer, knowing in advance that a certain

---

3. Title 26, United States Code, Section 1231 in effect provides for capital gain treatment with respect to "cattle . . ., regardless of age, held by the taxpayer for . . . breeding . . . purposes, and held by him for 12 months or more from the date of acquisition" but excludes "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business', from such treatment. Section 1231(b)(3) which applied for all of the years in issue, defined property used in the trade or business, and therefore entitled to capital gains treatment, to include:

"... other livestock, regardless of age, held by the taxpayer for draft, breeding, dairy, or sporting purposes, and held by him for 12 months or more from the date of acquisition."

Treas.Regs. § 1231-2(b) provides that the issue is a factual one which, although it may be proved by actual use of the animal for breeding purposes, can also exist under certain other circumstances:

"Whether or not livestock is held by the taxpayer for draft, breeding, or dairy purposes depends upon all of the facts and circumstances in each case. The purpose for which the animal is held is ordinarily shown by the taxpayer's actual use of the animal. However a draft, breeding, or dairy purpose may be present if an animal is disposed of within a reasonable time after its intended use for such purpose is prevented or made undesirable by reason of accident, disease, drought, unfitness of the animal for such purpose, or a similar factual circumstance. Under certain circumstances, an animal held for ultimate sale to customers in the ordinary course of the taxpayer's trade or business may be considered as held for draft, breeding, or

portion of its animals would be culled each year, held these animals for sale to customers in the ordinary course of business, and, therefore, any gain from such sales must be treated as ordinary income. At the conclusion of trial, special interrogatories were submitted to the jury which asked whether or not they found from the preponderance of the evidence that Duda was holding the Brahman cattle in dispute primarily for breeding purposes. The jury replied that it was not. Duda now moves this Court to set aside the verdict on that issue as contrary to the manifest weight of the evidence and to render judgment in its favor on the evidence adduced at trial.

Under the law, the question is clearly one of fact. McDonald v. Commissioner, 214 F.2d 341 (2d Cir. 1954). The Court is only justified in granting Duda's motion if, on the basis of the evidence presented at trial, without otherwise considering its weight or credibility, there can be but one reasonable conclusion. Continental Insurance Co. v. Sherman, 439 F.2d 1294 (5th Cir. 1971); O'Neill v. W. R. Grace & Company, 410 F.2d 908 (5th Cir. 1969). Upon careful consideration of the evidence in this case it is the opinion of this Court that the verdict on this issue is wholly unsupported by the evidence and the law and should be set aside with judgment rendered for the taxpayer.

The evidence of the size and details of the Duda cattle operation is not in dispute, and the particulars of the care and feeding of the purebred herd are fully covered in the testimony and are uncontradicted. Each new purebred calf is graded on three separate occasions during the first two years of its life, and separate records are kept on each animal.

As soon as it is determined that a calf is not suitable for the Duda's breeding operations, it is culled out and sold either directly to the slaughterhouse, through auction, or by private sale. The number of animals sold each year may run as high as 50% of the current calf crop. The total number of animals in dispute for the four years is 595, roughly 150 sales per year. The evidence did show that it was taxpayer's practice regularly to advertise the availability of bulls and cows for sale in various livestock publications.

This is not a case where the number of animals culled or their age depended upon the preferences or desires of prospective purchasers as in Fox v. Commissioner, 198 F.2d 719 (4th Cir. 1952). The animals culled for sale were not selected for their desirability as sale animals, but because they failed to measure up to the standards of the Duda breeding herd. The only conclusion that can be reached from the evidence is that the taxpayer's motive and primary purpose was to hold each animal for breeding purposes unless and until it should prove unfit for that purpose. That motive, and not whether in fact an animal is sold or whether the taxpayer knows a certain number of animals will be sold as a result of the culling process, must be the controlling factor in the tax treatment of those sales. McDonald v. Commissioner, *supra*.

The view advocated by the Government in this case, and arguably adopted by the Court in Fox v. Commissioner, *supra*, would seem to penalize breeders capable of detecting and culling inferior animals at an early stage. The view adopted by the United States Court of Appeals for the Second Circuit in *McDonald* is more consistent with the mo-

dairy purposes. However, an animal is not held by the taxpayer for draft, breeding, or dairy purposes merely because it is suitable for such purposes or merely because it is held by the taxpayer for sale to other persons for use by them for such purposes. Furthermore, an animal held by the taxpayer for other purposes is not

considered as held for draft, breeding, or dairy purposes merely because of a negligible use of the animal for such purposes or merely because of the use of the animal for such purposes as an ordinary or necessary incident, to the other purposes for which the animal is held."

tive-oriented intent of the statute and the realities of the cattle operation in question here:

"We think, however, that [a rule that when it is predictable that substantial numbers of cattle will be sold before breeding each year the cattle are 'held for sale' within the meaning of the Act] penalizes breeders with skill sufficient to detect and cull inferior animals even before they have been bred. True, an affirmative judgment that an animal is superlative cannot be made without examination of its offspring. But the evidence is compelling that a negative judgment can often be made on the basis of . . . [numerous objective factors]. Thus younger animals can be accurately culled, and the animals which the taxpayer sold were selected in this manner. Before an animal had been thus weeded out it was part of the regular herd, held for dairy and breeding purposes until it should prove unfit. [Citations omitted].

Of course it was in the taxpayer's contemplation that many or most of the animals would be found wanting and be sold. The operation might perhaps even have proved unfeasible without the income thus derived. And in a very real sense the taxpayer could have said at any moment that most of his calves were held for possible sale. But this was not the motive behind their retention, and legislative history of the new law shows that motive is to be controlling." 214 F.2d at 343.

▇▇ The evidence that Duda advertised the availability of purebred animals is entirely consistent with the fact that through the culling process Duda usually did have such animals for sale. If a cattleman, in an effort to recoup part of the high cost of grading and caring for a scientifically maintained breeding herd, attempts to obtain a higher price for its culls by advertising and selling to breeders in addition to its slaughterhouse sales, the advertising is only evidence of sound economic practice, not of any purpose of holding the cattle out for sale.

Considering all the evidence in a light most favorable to the Government, the Court concludes that the only reasonable conclusion is that the purpose for raising, grading, and culling the animals in issue was to determine which were suitable for breeding purposes, not to select those that could be sold. Accordingly, the Court finds as a matter of law that the cattle in question were held primarily for breeding purposes within the meaning of Section 1231 of the Internal Revenue Code and judgment should be entered for the taxpayer notwithstanding the verdict of the jury.

## SOIL DEPLETION ISSUE

Two of Duda's farms, located at Belle Glade and Zellwood, Florida, consist of peat or muck soil. The taxpayer sought to establish by the evidence in this case that the peat or muck soil on these farms is a wasting natural deposit so to entitle it to a depletion allowance pursuant to Section 611 of the Internal Revenue Code, or, alternatively, a depreciation deduction under Section 167.

The evidence in the case was uncontradicted that this type of soil does in fact oxidize and subside over a period of time. The real dispute in the evidence was whether the remaining land would still be useful for farming purposes after the depletion of the soil and whether or not a value could be assigned to the soil apart from the underlying strata.

The evidence was that the peat or muck in the area of Duda's farms subsides at a rate of approximately 1.1 inches per year, or roughly one foot in ten years. A substantial disparity exists in the testimony concerning the usefulness of the underlying strata and the value to be assigned to the wasting soil. The taxpayer's evidence was to the effect that these farms would no longer be useful for farming or any other purposes once the peat is reduced to a depth of 12 to 15 inches and that 90% of the purchase price of the land is attributa-

ble to the soil. On the other hand the Government's witnesses testified that the land will economically be useful for farming purposes even when the level of the peat reaches zero, and, therefore, no value should be assigned to the peat.

On the basis of this evidence, and in response to special interrogatories, the jury found that the average rate of subsidence on both farms was 1.1 *feet* per year, not inches as related in the testimony. Using that rate of subsidence, the jury calculated the amount of peat on the land at the date of purchase. For example, the jury found that there was 33.8 feet of peat on the portion of the Belle Glade farm purchased in 1945. The evidence is uncontradicted that there is currently 4–5 feet of peat. By employing a subsidence rate of 1.1 *inches* per year the parties have calculated that the soil depth was approximately 6½ feet at date of purchase.

■ The taxpayer contends that the jury merely made a mathematical error in using inches instead of feet and proposes that the Court make the computational corrections based on the evidence and render judgment based on the corrected verdict. The Government is apparently agreeable to this approach. The parties have entered into a lengthy stipulation correcting mathematical errors in the jury verdict to reach what they have stipulated to be the intent of the jury verdict. This Court is of the opinion that the stipulation of the parties does give effect to the apparent intent of the jury and incorporates the stipulation as a partial correction of the jury verdict.

## THE ADDITIONAL DEDUCTIONS

The taxpayer also sought to deduct certain soil and water conservation expenditures as ordinary and necessary business expenses incurred on its Belle Glade and Zellwood farms in the years 1964 and 1965. The deductions represent items which the taxpayer alleges were erroneously capitalized instead of expensed or deducted.

The only evidence on this issue was the taxpayer's cost accountant who testified as to the method by which he re-examined the "land clearing" account, which had been capitalized for the subject years, and reclassified certain expenditures which properly should have been expensed or deducted. The Government's position was simply that this testimony was not credible.

The jury was asked whether or not the taxpayer's figures (contained in plaintiff's Exhibit 14) correctly represented expenses for which no deduction had previously been taken. The jury answered the question in the negative, that is, in favor of the Government.

[■] The taxpayer moves to set aside that answer on the ground that it is contrary to the only evidence that was before the jury. The Government argues that the jury was entitled to disbelieve the taxpayer's evidence and points to matters brought out in cross-examination, such as the possibility that other errors may have been present in its books. With regard to this issue the jury's function was simply to decide whether Exhibit 14 was what it purported to be—a schedule of expenses for which the plaintiff had not already been afforded a deduction. The jury is entitled to disbelieve a witness, even though he is the only witness in a case. It is not within the province of this Court to overturn the jury verdict on the issue of these additional deductions.

It is, therefore

Ordered:

1. Plaintiff's motion for judgment notwithstanding the verdict as to the cattle issue is hereby granted, in all other respects said motion is denied.

2. Plaintiff's motions for new trial are hereby denied.

3. The parties shall prepare a final judgment in conformance with this Opinion and submit the same to the Court on or before November 15, 1974.