AMFAC, INC., ET AL.,[1] PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7236–75.     Filed May 23, 1978.

*Richard L. Griffith,* for the petitioner.
*Vernon R. Balmes,* for the respondent.

STERRETT, *Judge:* Respondent, on May 16, 1975, issued a statutory notice in which he determined a deficiency of $170,315 in petitioner's corporate income tax. The issue presented for our

---

[1] The subsidiaries of AMFAC, Inc., were not named in the petition.

determination is whether petitioner may deduct under section 175(a), I.R.C. 1954, expenditures, otherwise characterized as capital in nature, incurred in 1969 to improve three fields.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioner AMFAC, Inc., is a corporation with its principal place of business located in Honolulu, Hawaii. Petitioner and its subsidiary corporations, including Puna Sugar Co., Ltd. (hereinafter Puna), filed a consolidated income tax return for the calendar year 1969 with the Internal Revenue Service Center, Honolulu, Hawaii. Petitioner is a common parent and for all purposes is a sole agent for each subsidiary in the group, duly authorized to act in its own name in all matters relating to the tax liability for the consolidated return year 1969. Sec. 1.1502–77, Income Tax Regs.[2]

Puna operates a sugar plantation in the eastern section of the island of Hawaii. Puna's plantation has been in operation since approximately 1900. The plantation includes a sugar mill.

In 1969 Puna owned or controlled approximately 9,929 acres of land available for production of sugar cane. According to crop records which show production at 5-year intervals the number of acres harvested per year ranged from a high in 1940 of 8,207 to a low in 1970 of 5,026.

By 1967 certain equipment at the sugar mill, specifically the boilers and a crushing plant, which was used to extract juice from sugar, had become badly worn and in need of repair. In that year Puna's board of directors approved a boiler study which recommended installation of a new generator, diffuser, and boiler. It was suggested therein that the new equipment could accommodate considerable crop expansion. Puna installed a new boiler and diffuser in the mill. Installation of the new equipment substantially raised the mill's capacity with the result that it became feasible for Puna to cultivate new lands.

---

[2]Sec. 1.1502–77 specifically provides that the petitioner as such common parent will file petitions and conduct proceedings before the United States Tax Court, and any such petition shall be considered as also having been filed by each subsidiary of the group.

In 1968 Puna considered a proposal to cultivate an additional 5,000 acres over the next 7 years.[3] A plan was adopted in the latter part of 1968 pursuant to which the following expenses were incurred by Puna and claimed as deductible soil and water conservation expenses for its taxable year 1969:

| Interest | Field numbers | Acres on which work performed | Amount |
|---|---|---|---|
| Fee | 090 | 131.11 | $105,272.06 |
| Fee | 151 | 297.29 | 194,828.82 |
| Fee | 220 | 14.58 | 7,745.40 |
| Fee | 260 | 6.83 | 2,280.20 |
| Fee | 180 | 2.75 | 1,367.60 |
| Fee | 390 | 7.80 | 1,619.80 |
| Leased | 391 | 84.80 | 35,523.75 |
| Leased | 101 | 30.36 | 15,952.08 |
| | | | 364,589.71 |

The following amounts remain in issue:

| Field number | Amount |
|---|---|
| 090 | $73,310.06 |
| 151 | 194,828.82 |
| 220 | 0 |
| 260 | 0 |
| 180 | 0 |
| 390 | 0 |
| 391 | 19,266.75 |
| 101 | 0 |
| | 287,405.63 |

The acres on which these expenditures were incurred will hereinafter be referred to as the work areas.

The fields selected for cultivation by Puna were located in

---

[3] In subsequent years substantial changes were made to this program due to cash flow problems and the failure of the mill to attain the capacity as forecasted.

three geographical growing zones. Land was selected in each zone in order that the crops would have varying maturity dates of 24, 27, and 30 months. A balanced flow of cane to the mill would result from the staggered maturity dates.

The parties have agreed that the following list basically describes the steps that petitioner intended to take prior to planting. No issue has been raised that these steps were not in fact taken:

(1) Establish exploration lines to determine terrain and soil conditions.

(2) Determine detailed Soil Conservation Plan and location of permanent roads and drainage.

(3) Eradicate trees and brush and locate low areas where big rocks and brush will be placed.

(4) Remove from the low areas and stockpile all soil and organic matter to be used later as top dressing.

(5) Push brush and other waste material into the holes created by removal of soil.

(6) Remove and stockpile soil from higher spots.

(7) Rip high spots which are usually solid rock and move earth and rock from high spots into the holes on top of the brush and waste. This is the step during which the main land leveling and grading for drainage occurs.

(8) Push the stock piled soil evenly across the prepared surface with special consideration for saving of the soil and grading for drainage. The soil is compacted in this operation to prevent losses down through the loose underlying rock.

(9) Soil is removed from the prelocated road beds and spread across the prepared surface so that no soil will be lost under the road.

(10) Install roads by preparing roadbed leveling higher spots and bringing in gravel from infield stockpiles or from outside quarries. This cost is charged to roads.

(11) Necessary drainage ditches and culverts are constructed.

However, the work done in the work area of field 391 in 1969 consisted primarily of spreading waste mud which was collected at the mill during washing and processing of the cane. This mud was scooped up at the mill and piped to the work area where it was spread.

Field 391 covers 319.364 acres. Of the total acreage 79 acres were improved in 1968. The work area covered 84.8 acres. The contemporary records of Puna do not reflect cultivation of sugar cane in the work area prior to 1969. Planting of the work area commenced in January of 1970 and continued through February of 1970. The work area was planted in increments when it was ready for cultivation.

Field 090 covers 451.743 acres. Of the total acreage 252 acres

had intermittently been cultivated in sugar cane by Puna. An additional 68 acres were improved in 1968 at a cost of $31,962. The work area covered the remaining 131 acres. The contemporary records of Puna do not reflect cultivation of sugar cane in the work area prior to 1969. Planting of the work area commenced in July of 1968 and continued through November of 1969. The work area was planted in increments as it was ready for cultivation.

Field 151 covers 297 acres. Prior to and during 1969 sugar cane was being cultivated in this field in a 5-acre experimental plot. The work area covered the remaining 292 acres. The contemporary records of Puna do not reflect cultivation of sugar cane in the work area prior to 1969. Planting of the work area commenced in September of 1969 and continued through February of 1970. The work area was planted in increments as it was ready.

## OPINION

Puna expended certain sums in priming three fields for the cultivation of sugar cane. Petitioner contends that such amounts are deductible under section 175, I.R.C. 1954, as expenditures incurred for the purpose of soil or water conservation.

There is no question that such amounts were expended on work done to the three fields. However, respondent has determined that such items are nondeductible capital expenditures for the development of land that failed to satisfy the section 175(c)(2) definition of "land used in farming."

That definition requires that the land be used for the production of crops[4] by the taxpayer either prior to or simultaneous with the expenditure. The Income Tax Regs. expand this definition to include land newly acquired by the taxpayer if the previous owner used the land for farming and the taxpayer's use of the land is substantially a continuation of such prior use. Sec. 1.175–4(a)(2), Income Tax Regs. In *Estate of Straughn v. Commissioner*, 55 T.C. 21, 25 (1970), the Court held that in determining whether there has been a substantial continuation of use, a change in the type of crop cultivated is not significant because the definition of use in section 175(c)(2)

---

[4]The sec. 175(c)(2) definition more specifically includes land used "for the production of crops, fruits, or other agricultural products or for the sustenance of livestock."

makes only the broad distinction between the production of crops and livestock.

Petitioner contends that because the evidence discovered at the time Puna cleared the work area points to prior use of the land for sugar cane (field 090 appeared to have been furrowed at some time), coffee, oranges, bananas, and taro (in field 151 a few of these plants were discovered), Puna's cultivation of sugar cane was a substantial continuation of a prior use. Petitioner supports its contention by comparing the factual situation herein to that of *Behring v. Commissioner*, 32 T.C. 1256 (1959). In *Behring* the taxpayer's land was not newly acquired and had not been used in farming by the previous owner, but had been so used 30 years prior to the time of taxpayer's expenditures. The taxpayer contracted for the implementation of the conservation measures and in the same month entered into an agricultural lease. The lessees immediately entered upon the land and "planted it * * * as rapidly as the condition of the land made possible."[5] Admittedly there are some parallels between *Behring* and the factual situation herein. However, we find a number of distinguishable features.

In *Behring* the prior use of the land was within recorded history. Herein the prior use alleged by petitioner was not within recorded history. In *Behring* cultivation had been discontinued due to a climatic change; the declining rainfall. The taxpayer's use was enhanced by the availability of irrigation. The Court in *Behring* specifically noted that the land was ready for farming before it was irrigated. Herein the alleged prior use was so remote that the work area had to be recleared and developed into cultivable fields.

From the steps detailed in Puna's "conservation program" we discern that the work areas were not presently ready for farming. Step three calls for the eradication of trees and brush, an activity more accurately classified as clearing land than as soil and water conservation. Petitioner's witness testified that such activity constituted 30–35 percent of the time and cost of preparing the work areas of fields 090 and 151, and 25 percent of the time and cost of preparing the work area of field 391.

The legislative history of section 175 makes it clear that the

---

[5]*Behring v. Commissioner*, 32 T.C. 1256, 1258 (1959).

section was not intended to apply to development costs or the costs of making a field cultivable. At the time section 175 was enacted it was expected to affect the farmer in two ways. The most obvious of the two was to provide incentive for implementation of conservation measures. It was noted that little incentive existed where the conservation measure did not yield a return (Hearings on H.R. 8300 Before the Committee on Ways and Means, 83d Cong., 1st Sess. 936 (1953)) and constituted a nondepreciable expenditure whose cost could only be recovered on sale. Joint Comm. on Internal Revenue Taxation, Summary of the New Provisions of the Internal Revenue Code of 1954, p. 23 (1955). Recovery on sale is not only remote but often nonexistent due to obsolescence and deterioration. Often the increase in basis which should result from the "capital" improvement is difficult to substantiate. Hearings on H.R. 8300 Before the Committee on Ways and Means. 83d Cong., 1st Sess. 930 (1953). Secondly, the deduction of such amounts simplifies the accounting problems of the farmer. By specifying that such expenditures are deductible[6] the problem of distinguishing such amounts from normal operating costs is avoided. Hearings on H.R. 8300 Before the Committee on Finance, 83d Cong., 2d Sess. 1888 (1954).

We do not find Puna to be the type of farmer Congress was attempting to benefit by passage of section 175. With respect to the incentive aspect of section 175 the testimony of the witnesses uniformly reveals that the improvements undertaken by Puna resulted in superior fields of sugar cane. Thus, Puna can recover the costs through increased yield. The accounting problem is minimal because the amounts expended on these fields is readily distinguishable from the normal operating costs and, hence, are not difficult to substantiate.

Neither do we find that Puna used the land simultaneously with the expenditures. Close proximity of use is not sufficient. Cf. *A. Duda & Sons, Inc. v. United States*, 383 F. Supp. 1303, 1307 (M.D. Fla. 1974) revd. on other issues 560 F.2d 669 (5th Cir. 1977). Although we have found simultaneous use where some

---

[6]Such expenditures were generally capitalized, therefore the Tax Court's holding in *Collingwood v. Commissioner*, 20 T.C. 937, 943 (1953), that substantial expenditures for terracing were deductible as maintenance costs, encouraged Congress to enact legislation specifying criteria for deductibility. Joint Comm. on Internal Revenue Taxation, Summary of the New Provisions of the Internal Revenue Code of 1954, p. 23 (1955).

parts of the land were ready for planting prior to any improvement, *Behring v. Commissioner, supra* at 1260, where the total work area must be developed prior to cultivation the term simultaneous use does not encompass incremental planting of the area as the development of each portion is completed.

*Decision will be entered for the respondent.*