*Decision will be entered under Rule 50.*

BENEDICT O. WARREN, JR., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 91421. Filed September 20, 1963.

---

*Constantine D. Kasson* and *Franklin W. Klein*, for the petitioner.
*Charles B. Wolfe, Jr.*, for the respondent.

MULRONEY, *Judge:* The respondent determined deficiencies in petitioner's income tax for the years 1956, 1957, and 1958 in the amounts of $9,103.63, $10,893.62, and $16,545.23, respectively. The sole issue is whether petitioner is entitled to a deduction for cost or percentage depletion for topsoil in connection with his business of growing and selling sod.

### FINDINGS OF FACT

Some of the facts were stipulated and they are so found.

Benedict O. Warren, Jr., hereinafter called petitioner, is a resident of Palos Park, Ill. He filed his Federal income tax returns for the years 1956, 1957, and 1958 with the district director of internal revenue at Chicago, Ill.

Since 1945 petitioner has been engaged as sole proprietor in the business of growing and selling sod. Petitioner's brother, Robert M. Warren, has handled the sales for the business since 1951. Petitioner first grew sod on about 50 acres of rented land, then began to purchase land for this purpose in 1946 and subsequent years as follows:

| Date purchased | Grantor | Location | Total cost— land only |
|---|---|---|---|
| June 1947 | Ludwig | Palos Park, Ill | $5,000.00 |
| October 1947 | Doyle | ____do | 37,000.00 |
| March 1951 | Forschner | ____do | 25,000.00 |
| May 1953 | Sullivan | ____do | 18,125.92 |
| November 1953 | Butler | Tinley Park, Ill | 15,000.00 |
| June 1955 | Casey [1] | Palos Park, Ill | 56,000.00 |
| Do | Bisaga | ____do | 30,000.00 |
| October 1956 | Babcock | Crystal Lake, Ill | 30,000.00 |

[1] The Casey tract was conveyed in 1955 to a trust in which petitioner and his brother had equal beneficial interests.

The total acreage of the tracts of land and the portions of each tract devoted to growing sod were as follows:

| Tract | Total acreage | Used for growing sod | Still in use at time of trial |
|---|---|---|---|
| | | *Acres* | |
| Ludwig | 10 | 8 | None.[1] |
| Doyle | 78 | 66 | 41 acres. |
| Forschner | 60 | 57 | Unchanged. |
| Sullivan | 40 | 38 | Do. |
| Butler | 55 | 48 | Sold in 1957.[2] |
| Casey | 40 | 36 | Not shown. |
| Bisaga | 18 | 15 | Unchanged. |
| Babcock | 400 | 383½ | Do. |

[1] Part of this tract was retired from sod production in 1959 or 1960 and the remainder was retired from production in 1962.

[2] The Butler tract, which was purchased in 1953 for $15,000, was sold in 1957 for $84,000.

During the years 1956–58 petitioner also rented about 200 acres of land to grow sod, and sod was sold from this acreage during those years.

The introduction of Merion bluegrass in the late 1940's or early 1950's provided the impetus for the sod-growing industry. Merion bluegrass accounted for about 60 percent of petitioner's total sod production in 1956, about 70 percent in 1957, and about 85 percent in 1958. During these years the petitioner also grew some common Kentucky grass, creeping bent, final fescue, tall fescue, and Zoysia grass.

To prepare the soil for growing sod it is first plowed, disked, and graded. A smoother grading is required than for an ordinary farm crop. After the soil is fertilized, the seed is sown and the soil is kept moist until the seeds have germinated and reached a three- to five-leaf stage. After that point, the grass is watered about once a week, mowed about twice a week, and fertilizer is added about five times a year. During the years 1956, 1957, and 1958 the average time between planting and cutting was from 18 to 24 months. At the time of trial the average time had been reduced to about 12 months.

During the years 1956, 1957, and 1958 it was petitioner's practice, as soon as the sod was cut from a particular area, to plow the tract and to wait until mid-August before reseeding it.

The thickness of the sod cut has similarly been reduced over the years. Originally the thickness of the sod cut was from 2 to 3 inches, and, prior to the introduction of powered sod-cutting equipment in the late 1940's, it became common practice to cut the sod from 1¼ to 1½ inches thick. During the early 1950's petitioner and others conducted experiments to determine the proper thickness of the sod cut. As a result of such experiments (and with the control afforded by new cutting equipment), the petitioner by 1958 was making the sod cut from ¾ of an inch to 1 inch thick. During the years 1956, 1957, and 1958 petitioner was making the sod cut, on the average, from 1 inch to about 1¼ inches thick.

Petitioner cuts the sod in 6-foot lengths, with a width of 18 inches, except for Zoysia grass, which is cut 12 inches in width. During the years 1956–58 petitioner's practice was to cut sod from different portions of a particular field, depending on the stage of readiness of the sod. When the sod is cut, some topsoil is removed with it.

In addition to using large amounts of fertilizer to condition the soil, petitioner has made some small efforts to purchase topsoil and, at times, has moved topsoil from one area to another.

Petitioner's income tax returns for 1956, 1957, and 1958 show total receipts from his business (identified as "Warren's Turf Nursery" in Schedule C) in the respective amounts of $369,126.13, $282,153.73, and $520,662.81.

Petitioner allocated 50 percent of the total cost of each tract of land to the cost of the topsoil, and then wrote off the cost of the topsoil over a period of years. The tracts in the Palos Park area were written off on the basis of a 12-year period, while the Crystal Lake tract was written off initially on the basis of a 10-year period, which was subsequently (in 1958) reduced to an 8-year period. Petitioner treated the amounts written off each year as a part of its cost of goods sold for that year. The amounts deducted in each year were claimed without regard to the amount of sod grown, cut, or sold in that particular year.

Petitioner claimed deductions on his income tax returns for the value of topsoil purportedly consumed in the growing and selling of sod as follows:

| Taxable year: | Deduction claimed for topsoil consumed |
|---|---|
| 1952 | $3,083.33 |
| 1953 | 4,463.58 |
| 1954 | 5,713.58 |
| 1955 | 8,571.22 |
| 1956 | 12,440.29 |
| 1957 | 18,320.29 |
| 1958 | 21,156.15 |

No deduction was claimed by petitioner for topsoil purportedly consumed in the years 1946 through 1951. The deductions claimed by petitioner for the years 1952 through 1955 were not disallowed by respondent. It is stipulated that these years (1952 through 1955) are closed for purposes of assessment and collection of income taxes.

Respondent, in his statutory notice of deficiency, disallowed the deductions claimed by petitioner for the years 1956, 1957, and 1958 with the explanation that "costs of sales as reported on your income tax returns for the years 1956, 1957 and 1958 are overstated to the extent you included therein cost of soil in the amounts of $12,440.29, $18,320.29 and $21,156.15, respectively."

OPINION

Petitioner, during the years in issue, was engaged in the business of growing and selling sod on about 650 acres that he owned and about 200 acres that he rented. In producing sod for sale, a portion of topsoil is physically removed from the land. In computing his costs of sales for the years 1956, 1957, and 1958, petitioner included therein cost of soil in the amounts of $12,440.29, $18,320.29, and $21,156.15.

Although petitioner treated the above amounts as part of the cost of goods sold that year, they bore no relation to the amount of sod sold in that particular year. Petitioner used a formula for the years in issue and prior years that he or his accountant devised whereby half the cost of a tract he bought was allocated to cost of topsoil and then written off on the basis of 8, 10, or 12 years, based on his estimate of the number of crops of sod he could obtain from the land. The accountant testified: "Actually it [topsoil] was amortized over a period of years."

Respondent disallowed the above amounts in full, determining that petitioner had overstated his costs of sales by including therein the above amounts identified as cost of soil in petitioner's computation. Petitioner in his petition alleged error in respondent's refusal to grant him any allowance for the cost of topsoil, and he alleged since "a portion of the top soil becomes part of the sod and is removed with the sod sold, * * * [he] * * * is entitled to a reasonable allowance each year for (a) Depletion of such topsoil, or (b) Depreciation of such sod land by reason of the removal of top soil therefrom, or (c) The cost or market value of the top soil thus removed as part of the cost of the sod sold."

Petitioner makes no effort to justify his formula for computing the deductions or to argue (b) above to the effect that he would be entitled to "depreciation" of land. The record would not support any deduction, and petitioner makes no argument under (c) above.

At the trial counsel for petitioner stated that it was petitioner's contention that he was entitled to a reasonable allowance for depletion of the land. He stated that some of the land was peatland and it was petitioner's position that he was entitled to percentage depletion on that land and cost depletion on the balance which is described as mineral land. On brief, petitioner's sole reliance is upon the contention "that he is entitled to a percentage depletion allowance as to the peat lands and a cost depletion allowance as to the mineral lands." By some computations of cost and percentage depletion allowances, upon which we will comment later, petitioner arrives at totals which are surprisingly close to the figures he used as cost of soil items.

Section 611 of the Internal Revenue Code of 1954 provides, generally, that "In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion * * * according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate.".

Petitioner contends that topsoil is a "natural deposit" within the language of the above statute and that when the sod is cut, topsoil is severed and sold along with the grass. Respondent does not argue that topsoil is not a "natural deposit" within the language of section 611.[1] He contends, on brief, that said statute was not "intended to apply to an activity which is essentially a farming operation."

It must be admitted that some of the natural deposit or topsoil is being exhausted by physical removal when the land is used for sod production. In this it differs from other farming activities where that which is taken from the soil is its nutrients. In the ordinary farming operation the soil can be reconditioned by fertilizers designed to replace the plant food consumed in the farming operation. The record here shows that petitioner spreads large amounts of fertilizer on the land he uses for sod production. But the land cannot be wholly reconditioned so that it will always remain suitable for sod growing without, as petitioner contends, actual replacement of the topsoil that has been removed. Does that mean that a sod producer is entitled to depletion?

It at once appears that the topsoil which is being exhausted can be replaced. Petitioner admits that topsoil can be purchased and spread on the tracts. He testified: "We have done a little bit of replacing by moving soil from some areas on our place to other areas, an area that was * * * too small to justify growing, and then we have bought a small amount of soil for bringing it in. This has never been very significant. We have done quite a lot of investing to see whether we could justify this, and our conclusion has always been, when we've done this investing, that this wasn't a feasible thing to do."

Respondent, in his argument that petitioner is not engaged in an extractive industry that would entitle him to depletion under section 611, makes much of the fact that topsoil can be replaced. Respondent implies on brief that expenditures made to recondition land by replacing topsoil can be deducted under other sections of the statute as business expenses. But it is not at all clear whether a major and expensive operation like the replacement of topsoil on extensive

---

[1] Respondent has ruled that soil in place is a natural deposit within the meaning of sec. 23(m) of the Internal Revenue Code of 1939 (former version of sec. 611) and that, if such soil is severed and sold by the owner, the proceeds are subject to a cost depletion allowance computed in the manner set forth in the regulations (sec. 29.23(m)-1, Regs. 111).

tracts of land can be claimed as an expense deduction under other sections of the statute. See secs. 175 and 180, I.R.C. 1954.

However, we need not decide whether a sod producer is entitled, under any circumstances, to a depletion allowance for the loss of top-soil, since even if we were to hold for petitioner on the basic question, petitioner has completely failed to establish the amounts of depletion claimed by him during the years before us.

As expressly required by section 611, I.R.C. 1954, respondent has provided detailed regulations which provide the framework for computing both cost and percentage depletion. Added weight should be given to regulations prepared under such circumstances. See *Helvering* v. *Wilshire Oil Co.*, 308 U.S. 90. Section 1.611-2, Income Tax Regs., provides the method for the computation of cost depletion of mines, oil and gas wells, and other natural deposits. Section 1.611-2(a)(1), Income Tax Regs., states that "After the amount of [the] basis applicable to the mineral property has been determined for the taxable year, the cost depletion for that year shall be computed by dividing such amount by the number of units of mineral remaining as of the taxable year * * *, and by multiplying the depletion unit, so determined, by the number of units of mineral sold within the taxable year * * * ." The regulation's subsection further states that "In the selection of a unit * * * for depletion, preference shall be given to the principal or customary unit or units paid for in the products sold, such as tons of ore, barrels of oil, or thousands of cubic feet of natural gas." Section 1.611-2(a)(3), Income Tax Regs., defines the "number of units of mineral remaining as of the taxable year" as the number of units of mineral remaining at the end of the year to be recovered from the property plus the number of units sold within the year.[2] Section 613 provides that "In the case of * * * natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property" with the proviso that "Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion)." Section 613(b) provides as follows:

SEC. 613. PERCENTAGE DEPLETION.

(b) PERCENTAGE DEPLETION RATES.—The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:

\*    \*    \*    \*    \*    \*    \*

---

[2] Sec. 611(a) of the Internal Revenue Code of 1954 provides that "In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this section for subsequent taxable years shall be based on such revised estimate."

    (5)  5 percent—
      (A) * * * peat * * *

  *         *         *         *         *         *         *

    (6)  15 percent—all other minerals * * *. For purposes of this paragraph, the term "all other minerals" does not include—
      (A) soil, sod, dirt, turf, water, or mosses; * * *

It is to be noted section 613(b)(6)(A) specifically excludes "soil, sod, dirt, turf" from the benefits of the percentage depletion allowance (15 percent) for "all other minerals" under that subsection. Petitioner's product falls squarely within the exclusion and it would seem unimportant that the sod is grown on peat soil, mineral soil, or any other kind of soil. But because some of petitioner's sod is grown on peat soil, he feels he can avoid the language of section 613(b)(6)(A) and that he is entitled to a percentage allowance (5 percent) for peat under section 613(b)(5)(A).

There is no merit in petitioner's argument that he is entitled to any percentage depletion allowance for peat. There is no evidence that petitioner even owned peat deposits within what we feel must be the definition of "peat" as used in the statute. Peat as used in the statute means an extractable deposit of partially carbonized vegetable matter which, when extracted, is sold as a separate product for use as fuel, fertilizer, or packaging.[3]

Petitioner argues he is entitled to 5-percent depletion on 450 acres of his land because it is composed of "peat soil." This merely means his land on which grass was growing contained a fertilizer substance known as peat—something he might have had to add if not already present in the soil in order to grow good grass.

Moreover, the statute plainly provides the percentage depletion is for one who produces peat. Petitioner was in the business of producing sod, not peat. Section 613 allows a percentage depletion allowance based on certain percentages of the "gross income from the property" and section 613(c) plainly defines "gross income from the property" as gross income from the extraction of the particular ores or minerals from the ground (as well as certain treatment processes). Petitioner received no gross income from peat. The fact that the land contained some peat is not alone sufficient to warrant any depletion allowance because of his use of the land in his sod business.

---

    [3] The 1961 Minerals Yearbook, vol. II, Fuels, U.S. Bureau of Mines, devotes a chapter to peat production in the United States and other countries. There it is stated (p. 285) : "Peat is defined as any partially decomposed plant matter that has accumulated under water or in a water-saturated environment. It is unlawful to designate a product 'peat' unless 75 per cent of the material, on a dry-weight basis, is composed of peat, as defined above, and the remainder consists of normally associated soil materials." The same source reports with respect to production, reserves, consumption, extraction methods, and uses of peat in the United States where it is chiefly used as fertilizer, and foreign countries where it is chiefly used as fuel.

Again petitioner's computation figures for percentage depletion could never be accepted. He states on brief that approximately 450 acres out of some 650 acres of land utilized by him for sod growing, or about 70 percent, was composed of peat soil. Therefore, since sod was cut and sold from all of the lands during the years 1956, 1957, and 1958, the gross receipts from his peatlands would be 70 percent of his total receipts for those years, or the respective amounts of $365,700.60, $288,230.01, and $545,330.69,[4] or $255,990.42 for 1956, $201,761 for 1957, and $381,731.48 for 1958. By applying the 5-percent rate to these amounts, petitioner computes his percentage depletion to be $12,799.52 for 1956, $10,083.05 for 1957, and $19,086.07 for 1958.

Such a computation would be obviously incorrect even if it be thought petitioner was entitled to any percentage depletion based on extraction and sale of peat. Petitioner cannot use the total receipts from the growing and selling of sod as the starting point in his computation of percentage depletion of peat.[5]

Section 613 provides that the allowable depletion "shall be the percentage, specified in subsection (b), of the gross income from the property." Section 614(a) states that "For the purpose of computing the depletion allowance in the case of mines, wells, and other natural deposits, the term 'property' means each separate interest owned by the taxpayer in each mineral deposit in each separate tract or parcel of land." Section 614(b) permits a taxpayer, under certain circumstances, to elect to treat as one property two or more of his separate mining interests. Petitioner has ignored this statutory requirement to treat separately each of his separate tracts or parcels of land, and he has not made any election to treat any of his separate interests as one aggregate property. Also, since petitioner admitted at the trial that his books and records do not break down the total yards of sod sold in each year according to individual fields, it is obvious he is in no position to supply the necessary facts for a correct computation of percentage depletion under the statute.

Petitioner's computation of cost depletion must also be rejected because again it completely ignores the statute and regulations which provide the exact method for making this computation.[6] As stated,

---

[4] Petitioner does not explain the computation of these amounts. In his returns for 1956, 1957, and 1958 he reported total receipts from his business in the respective amounts of $369,126.13, $282,153.73, and $520,662.81.

[5] Since the total receipts figures evidently include the sales of sod from rented land, the error is further aggravated.

[6] Petitioner explains his computation of cost depletion on brief, as follows:

"The evidence and stipulated facts show that the Palos and Tinley Park lands cost $186,125.92 and that the Crystal Lake lands cost $30,000.00. Since 55% of the Palos

petitioner did not take depletion deductions on his income tax returns and obviously did not keep his books and records in such a manner as to reflect the necessary information. This probably accounts for the fact that in his computation he indulges in conjectures and estimates where evidence is lacking, and completely disregards the method prescribed by the regulations. As in his computation for percentage depletion, the petitioner fails to treat each tract or parcel of land separately. Sec. 614. We have no way of determining from this record what the number of units remaining as of the end of the taxable years 1956, 1957, and 1958 might be on the various tracts used by petitioner in these years for growing sod on mineral soil, see sec. 1.611–2, Income Tax Regs., and it does not appear that petitioner's records could supply this information. The computation also fails to allow any residual values for the various tracts. See section 1.612–1, Income Tax Regs., which provides that the basis upon which cost depletion is to be computed under sections 611 and 612 is the cost of the property less the residual value at the end of the operations. Moreover, except for figures for cost of the various parcels of land, it appears that the remaining figures used by petitioner in his computation are estimates. Enough has been indicated, we believe, to show that petitioner's computation completely ignores the statute and regulations and must be rejected.

We hold, on the basis of this record, that petitioner is not entitled to cost or percentage depletion deductions during the years 1956, 1957, and 1958.

*Decision will be entered for the respondent.*

---

lands and 15% of the Crystal Lake lands are composed of mineral soil, using the same ratio results in 146 acres of mineral lands costing $106,869.25. The evidence further showed that once the topsoil is removed from the Palos lands, from an agricultural standpoint the lands at best would make a poor pasture. As to the Crystal Lake property, because of the high water table, once the topsoil is removed, the land would be marshland with little or no value. As was previously pointed out, 70% of the land purchased is peat land, leaving 30% as mineral land. Of the 650 acres used for sod growing, this would leave 195 acres of mineral soil, and by taking 15% of the cost of the Crystal Lake property and 55% of the Palos lands, the total of $106,869.25 or $548.00 per acre represents the average cost of the mineral lands. Dividing the average cost of $548.00 per acre by 43,560 results in an average cost of $.0126 per cubic foot of mineral topsoil. Of the 14,460 cubic yards in 1956, 11,560 cubic yards in 1957 and 23,440 cubic yards in 1958 of topsoil removed, 4,330 cubic yards of topsoil were removed from the mineral lands in 1956, 3,468 in 1957 and 7,032 in 1958. By multiplying the cubic yards of mineral topsoil removed in each year by 27 in order to determine the number of cubic feet removed, we find that 117,126 cubic feet were removed in 1956, 93,636 cubic feet in 1957 and 189,864 cubic feet in 1958. At a cost of $.0126 per cubic foot, Petitioner submits that the allowable cost depletion deduction for topsoil removed from the mineral lands should be as follows:

In 1956, $1,475.00,
In 1957, $1,179.00, and
In 1958, $2,392.00."