**A. DUDA & SONS, INC.,**
**Plaintiff-Appellee,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

**No. 75–2546.**

United States Court of Appeals,
Fifth Circuit.

Oct. 7, 1977.

---

670

John L. Briggs, U. S. Atty., Jacksonville, Fla., Scott P. Crampton, Asst. Atty. Gen., Gilbert E. Andrews, Acting Chief, Appellate Section, Jonathan S. Cohen, Ann Belanger Durney, Tax Div., Dept. of Justice, Washington, D. C., Kendell W. Wherry, Asst. U. S. Atty., Orlando, Fla., for defendant-appellant.

Robert H. Kennedy, Eric M. Oakley, Cleveland, Ohio, William Y. Akerman, Orlando, Fla., for plaintiff-appellee.

Before GOLDBERG and HILL, Circuit Judges and KERR,* District Judge.

GOLDBERG, Circuit Judge:

The facts of this tax refund case are rooted in peat and muck. The principal issue on appeal is whether the taxpayer, A. Duda & Sons, Inc., is entitled to cost depletion deductions for peat topsoil that is subsiding through oxidation as a natural consequence of having been drained for cultivation. The government argued below and reiterates here that extraction of a natural

* United States Senior District Judge, District of Wyoming, Sitting by designation.

deposit is a necessary prerequisite to depletion deductions for the exhaustion of that deposit, pursuant to I.R.C. § 611. The district court, in allowing evidence of depletion to go to the jury, ruled otherwise.

A second issue is whether the district court correctly entered a judgment notwithstanding the jury's verdict regarding Duda's claim for capital gains treatment of its sales of certain cattle. The jury determined that the taxpayer held those cattle primarily for sale in the ordinary course of business. The district court disagreed and found that Duda held the cattle for breeding purposes, thereby entitling the taxpayer to capital gains treatment on sale.

The government has taken this appeal. We reverse the district court's judgment regarding both issues.

## I. Depletion

### A. Facts

■ During the tax years contested in this case, taxpayer owned and operated the Belle Glade Farm and the Zellwood Farm in Florida. The topsoil on both farms consists of peat and muck soil composed of partially decomposed plant deposits. This organic soil is a uniquely rich and fertile medium in which to grow vegetables. Consequently it has a value greater than that of other soils.

Water covered the peat soils on both Duda farms prior to their cultivation. Cultivation requires lowering the water table, draining and compacting the soil, and applying various chemicals. The inevitable and irreversible result of cultivation is that the heavily carbonized soil oxidizes, releasing carbon dioxide gas and gradually subsides. One can halt or impede this process only by flooding the soil, which precludes cultivation of crops. In short, at the present state of our technology one can either maintain the level of peat soil or raise crops. One cannot do both.

Taxpayer, perhaps heeding Voltaire's sardonic dictum, chose to cultivate its garden. It then observed, more literally than did the good Dr. Pangloss, that the ground gradually gives way beneath one in this best of all possible worlds. Primarily through oxidation, the soil on its farms subsided at an average rate of 15 inches for the first year of cultivation and 1.1 inches per year thereafter. The peat soil on taxpayer's farms presently reaches a depth of about four or five feet.

Duda brought suit in district court to recover the federal income taxes attributable to the disallowed depletion or depreciation deductions for the subsiding peat. After denying the government's motion for judgment on the pleadings, the district court allowed Duda's evidence of depleting peat resources to go to the jury. As applied by the court, the jury's special verdicts meant that Duda was entitled to take cost depletion or depreciation deductions for the peat, calculating its cost as that portion of the farm purchase price allocable to the peat and muck.

Belle Glade Farm contains a layer of soft, partially decomposed limestone material called "marl" and some limestone rock underneath its peat soil deposit. Duda presented evidence that the limestone is not economically suitable for farming. The government's witnesses testified that the land could still be successfully farmed even when the peat was entirely gone. Zellwood Farm contains hardpan clay and sand underneath its peat. The sand and clay soil is suitable for farming. Duda claimed that once the peat soil on either farm was reduced to a depth of 12 to 15 inches, it could not be used for farming.

The jury could not determine a depth at which the peat deposit on either farm would no longer be useful in farming. The court did not ask the jury to find whether farming would be impossible on the Belle Glade Farm once the peat was gone.

The jury did find that taxpayer had paid one-half of the price per acre of the Belle Glade Farm for the peat soil alone and one-half for the underlying strata. With respect to the Zellwood Farm, the jury found that the entire purchase price per acre was allocable to the sand and clay substrata.

The only deductions at issue here involve the Belle Glade Farm. Duda's deposit of peat soil on this farm averaged 5½ feet when purchased. It has been subsiding all the Duda day since taxpayer began cultivating it and is now 4 to 5 feet in depth. The jury found that it will disappear within 35 years.

## B.  Extraction or Severance

The government concedes that peat soil is a "natural deposit" as that term appears in § 611 of the Code.[1] It does not dispute that as a result of cultivation the peat is subsiding at a rate of 1.1 inches per year nor that in 35 years Belle Glade Farm's peat soil will be exhausted. It does not dispute the jury's finding that half of the farm's purchase price per acre was allocable to the peat.[2] Its sole contention is that as a matter of law Duda is not entitled to depletion deductions for the peat because extraction or severance of a natural deposit is a necessary prerequisite to a § 611 deduction. The government urges that the cost depletion deduction is not available for a natural deposit that is wasting in place.

If the taxpayer exhausted the peat by digging it up and selling it to produce income, the government would grant the deduction.[3] Because the taxpayer exhausts the peat in the process of raising vegetables that are sold to produce income, the government would deny the deduction. The government does not argue that the distinction between the two cases is that in one the depletable asset itself is sold while in the other the taxpayer exhausts the asset on its own premises.[4] Instead, the government bases its entire argument on appeal on the notion that the difference between the two cases is that in one the taxpayer extracts the asset while in the other the taxpayer leaves the asset in place.

The government's position finds no support whatever in the language of § 611, nor do other provisions of the Code offer a clear answer. The Congress has never expressly required that a taxpayer prove extraction or severance as a prerequisite to a depletion deduction. In the applicable legislative history, Congress simply does not squarely address the question. The issue here is whether Congress's reticence regarding this question is attributable to the axiomatic nature of the answer. That is to say, Congress may have thought it obvious that extraction was bound up with the concept of depletion and never contemplated allowing depletion deductions in other than extraction situations. No court has allowed a

1.  Section 611(a) of the Code provides, in pertinent part:

    In the case of mines, oil and gas wells other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. For purposes of this part, the term "mines" includes deposits of waste or residue, the extraction of ores or minerals from which is treated as mining under Section 613(c) .  .  .

2.  Section 612 of the Code establishes the basis for cost depletion deductions. It provides:

    Except as otherwise provided in this subchapter, the basis on which depletion is to be allowed in respect of any property shall be the adjusted basis provided in section 1011 for the purpose of determining the gain upon the sale or other disposition of such property. It is undisputed that the court below calculated the amount of the deduction awarded Duda in accordance with the requirements of § 612 and

the jury's finding regarding Duda's cost for each peat deposit. The only point of dispute is whether Duda's claim is allowable under § 611.

3.  Pursuant to § 613(b)(6) of the Code, the taxpayer could also take percentage depletion at the rate of 5 percent. For purposes of percentage depletion, the distinction between "peat" that is extracted and "peat soil" has been made as follows: "Peat as used in the statute [§ 613(b)(6)] means an extractable deposit of partially carbonized vegetable matter which, when extracted, is sold as a separate product for use as fuel, fertilizer, or packaging." *Warren v. Commissioner*, 40 T.C. 991, 998 (1963). The taxpayer does not raise the issue of percentage depletion in the case at bar.

4.  Whatever plausibility such an argument might have as a matter of first impression, it has been foreclosed by *United States v. Shurbet*, 347 F.2d 103 (5th Cir. 1965), discussed *infra* at note 11, which allowed depletion deductions for the exhaustion of an asset that the taxpayer did not sell to another.

depletion deduction when the taxpayer did not extract or sever the depletable asset from the ground. But, of course, no court has ever decided whether a taxpayer is entitled to depletion deductions for peat that is subsiding in place.[5]

In short, we must decide this case outside the realm of the explicit, the black letter statement, or the certitude, but rather within the web of unarticulated assumptions and judicial inferences from those assumptions. The confluence of legislative history, semantics, and philology cannot write this opinion. We must search hard for a tax loom to solve our loam problem.

## C. The Cost Depletion Deduction

Section 611 authorizes a deduction for depletion in the case of "mines, oil and gas wells, other natural deposits, and timber." The purpose of the deduction is to permit the owner of a capital interest in a natural resource in place to deduct the cost of that interest as the interest is exhausted. Otherwise expressed, depletion is predicated on allowing the owner of a capital interest of a mineral or other depletable natural resource to make a tax-free recovery of that depleting capital asset. *See generally, Paragon Jewel Coal Co. v. Commissioner of Internal Revenue*, 380 U.S. 624, 631, 85 S.Ct. 1207, 1211, 14 L.Ed.2d 116 (1965); *Commissioner of Internal Revenue v. Brown*, 380 U.S. 563, 575, 85 S.Ct. 1162, 1168, 14 L.Ed.2d 75 (1965); *Parsons v. Smith*, 359 U.S. 215, 79 S.Ct. 656, 3 L.Ed.2d 747 (1959).

The depletion deduction is totally dependent upon statute and has no independent significance in tax law as a legal or equitable principle. It is solely a matter of legislative grace. *Commissioner of Internal Revenue v. Southwest Exploration Co.*, 350 U.S. 308, 311, 76 S.Ct. 395, 398, 100 L.Ed. 347 (1956); *Anderson v. Helvering*, 310 U.S. 404, 407, 60 S.Ct. 952, 954, 84 L.Ed. 1277 (1940). Unless we can find in the language of § 611, the applicable legislative history, or the relevant treasury regulations some recognition that a case of this general type merits a depletion allowance, the taxpayer must fail. Logical consistency alone does not govern in the land of legislative grace; there must be some evidence that Congress intended to include within the ambit of § 611 the kind of case presented here. In short we must decide whether the legislature has said grace over subsiding peat and muck.

The concept of depletion first found expression in Section II, G(b) of the Income Tax Act of 1913. The Act permitted corporations to deduct:

. . . in the case of mines, a reasonable allowance for depletion of ores and all other natural deposits, not to exceed 5

5. The Commissioner, however, has clearly answered this question. Rev.Rul. 55–730, 1955–2 Cum.Bull. 53, sets forth the Commissioner's position on the precise issues presented by the case at bar:

Advice has been requested whether a taxpayer who has purchased and cultivates a farm in Florida comprised of land with peat soils may recover the cost of the farm through allowances for depletion or depreciation.

The taxpayer's farm is located in Florida where peat soils are subject to subsidence as a result of oxidation, compaction and the lowering of the water level. After subsidence reaches a certain level, proper drainage becomes extremely difficult, if not impossible, and the abandonment of the use of these lands for farming has been forecast by competent authorities. This process is not a mining operation in which minerals are extracted from the land, and the depletion provisions are not applicable.

Section 39.23(1)–2 of Regulations 118, made applicable to section 167 of the 1954 Code by Treasury Decision 6091, C. B. 1954–2, 47, provides that the depreciation allowance applies to that which is subject to wear and tear, to decay or decline from natural causes, to exhaustion, and to obsolescence due to the normal progress of the art, as where machinery or other property must be replaced (1) by a new invention or (2) due to the inadequacy of the property to the growing needs of the business. It does not apply to inventories or to stock in trade, or to land as such.

Accordingly, it is held that the cost of farm land with peat soils, which by reliable estimate will subside to the extent of wide-scale abandonment of the use of the land within the next half century, may not be recovered by depreciation or depletion allowances.

per centum of the gross value at the mine of the output for the year for which the computation is made . . .

Income Tax Act of 1913, ch. 16, 38 Stat. 114, 116, 172. Because that Act limited depletion to "the case of mines," its authors obviously envisaged a severance requirement.

Unlike the 1913 Act, the Revenue Act of 1916 did not mention "natural deposits." Nonetheless, it specifically provided for depletion deductions for oil and gas as well as "mines." It also restricted the deduction regarding mining products to those that were sold. The 1916 Act provided corporate deductions of

. . . (a) in the case of oil and gas wells a reasonable allowance for actual reduction in flow and production to be ascertained not by the flush flow, but by the settled production or regular flow; (b) in the case of mines a reasonable allowance for depletion thereof not to exceed the market value in the mine of the product thereof which has been mined and sold during the year for which the return and computation are made, such reasonable allowance to be made in the case of both (a) and (b) under rules and regulations to be prescribed by the Secretary of the Treasury . . . .

Revenue Act of 1916, ch. 463, 39 Stat. 756 § 12(a) Second.

The authors of the depletion provision still could not have envisioned allowing a depletion deduction in any case in which the taxpayer failed to sever or extract the natural resource. Both enumerated classes of depletable resources in the 1916 Act themselves entailed severance.

The Revenue Act of 1918 restored the term, "natural deposits", to the depletion provision while clearly separating it from "mining", which the 1913 Act had failed to do. The 1918 Act also eliminated the requirement that mining products be sold. Section 234(a)(9) of the 1918 Act allowed the following deductions to corporations:

In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case, based upon cost including cost of development not otherwise deducted . . .

Revenue Act of 1918, ch. 18, 40 Stat. 1057, § 234 (a)(9).

To be sure, it is only with the 1918 Act that the question whether severance should be a condition precedent to the depletion deduction could independently have arisen. Nonetheless, the inclusion in the earliest versions of the depletion provision of only situations that entailed extraction or severance may weigh in favor of the government's position in this case. The changes made by the 1918 Act are entirely consistent with the notion that Congress still envisaged only severance situations, although the category of "natural deposits" does not logically entail that restriction. Certainly, nothing in the legislative history of the 1918 Act suggests that Congress intended to allow depletion deductions for other than extraction or severance situations.

One treasury regulation contemporaneously issued under the 1918 Act buttresses the notion that Congress envisaged depletion deductions only when the taxpayer had extracted the natural deposit. Article 201, Treasury Regulation 45 (1920 ed.), makes clear that in determining the taxpayer's basis in depletable assets, only value for purposes encompassed by the depletion provisions may be considered. Article 201 provides:

The essence of these [depletion] provisions of the statute is that the owner of mineral deposits, whether freehold or leasehold, shall within the limitations prescribed, secure through an aggregate of annual depletion and depreciation deductions the return of either (a) his capital invested in the property, or (b) the value of his property on the basic date, plus subsequent allowable capital additions . . . *but not including land values for purposes other than the extraction of minerals* [emphasis added].[6]

6. Between 1918 and 1926, the taxpayer could base the depletion deduction on either cost or the fair market value of the property at the time of discovery. *See* 4 J. Mertens, *Law of*

Since Article 201 later defines "minerals" to include "metals, coal, oil, gas, and such nonmetallic substances as . . . peat," the Regulation's emphasis on "the extraction of minerals" may be significant. To begin with, it seems clear that the Regulation was intended to cover the full range of depletion deductions.[7] Article 201's exclusion of land value based other than on its use for "extraction" purposes suggests that the Internal Revenue Service contemporaneously viewed the authors of the 1918 Act as concerned only with the extractive industries.[8]

To be sure, this does not foreclose the possibility of depletion deductions absent extraction or severance. After all, depletion of a natural resource through means other than extraction was not a question that the Congress that passed the 1918 Act or the agency that promulgated the regulation specifically addressed. The most that can be said is that neither the drafters of the 1918 Act nor the authors of Article 201 considered the possibility of deductions in non-extractive situations. This factor, although not decisive, weighs in favor of the government's position in the case at bar.

The Internal Revenue Code of 1954 retains the basic structure of the 1918 Act's cost depletion provision: "In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed . . . a reasonable allowance for depletion . . . ." I.R.C. § 611. Nothing in the language of § 611 or related sections of the Code tells us whether extraction is a condition precedent to a depletion deduction.

Current Treasury regulations, however, cast some light on this matter. Treasury Reg. § 1.611–1(b)(1) (1960), which purports to define the nature of the economic interest requisite to claiming a deduction for depletion,[9] provides in part:

> Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and se-

*Federal Income Taxation* § 24.03 (rev.ed.1973). Percentage depletion represented a legislative attempt to avoid the problems arising in connection with the computation of discovery depletion. *See* Revenue Act of 1926, Ch. 27, § 204(c), 44 Stat. 9.

7. The taxpayer argues that Article 201 cannot have been intended to apply to all depletion deductions because it omits any reference to timber, a natural resource for which the 1918 Act plainly allows a depletion deduction, and because it is limited to depletion of "minerals." This argument is incorrect. Timber, alone among the resources for which the 1918 Act allowed depletion deductions, could not be "discovered" in the sense that minerals must be. Hence the value of timber on the "basic date" is unimportant and "discovery depletion" essentially irrelevant. For purposes of ensuring return on capital, the historical cost of timber is sufficient. Hence Article 201's omission of timber is not significant. Second, that Article 201 is limited to minerals cannot help the taxpayer here. As we have noted, the regulation includes among "minerals" various natural deposits including clay, marl, sand and most significantly, peat.

8. Similarly, Article 201(d) defined the value of a mineral deposit as "its cost or . . . the value of the mineral property, less the value of the plant, equipment, and surfacer of the land for purposes other than mineral production." It seems fair to say that "mineral production" entails extraction. Article 202 also specified the amount recoverable through deductions as excluding the value of land for purposes other than mineral production. Article 217 required a statement to be attached to the return of a taxpayer claiming depletion that set out "(6) the value of the surface of the land for purposes other than mineral production," and "(8) the number of units sold during the year . . . ." Assuming these provisions were intended to apply generally, (or at least to all minerals, including "peat" but excluding "timber"; see note 7, *supra*) they evince the Commissioner's belief that Congress intended to grant depletion deductions to the extractive industries. Provisions similar to these have been contained in regulations promulgated under subsequent revenue acts. *See, e. g.,* Treas. Regs. 62 (1922 ed.), Arts. 201, 202, 217; Treas. Regs. 65 (1924 ed.), Arts. 201, 202, 218; Treas. Regs. 69 (1926 ed.), Arts. 201, 202, 218.

9. *See Commissioner of Internal Revenue v. Southwest Exploration Co.,* 350 U.S. 308, 314, 76 S.Ct. 395, 100 L.Ed. 347 (1956).

cures, by any form of legal relationship, *income derived from the extraction of the mineral or severance of the timber*, to which he must look for a return of his capital. [emphasis added]

Again, of course, the regulation does not purport to limit the manner in which a depletable asset must be depleted in order for its owner to qualify for a § 611 deduction. On the other hand, Treas.Reg. § 1.611–1(b)(1) does seem to assume that the manner will always be extraction. The most that Duda can claim is that the words "extraction" and "severance" were used uncritically by the authors of a regulation devoted to other issues. Even on that view, however, the assumption that "extraction" was a suitable word weighs in favor of the government's position in the case at bar.

Other regulations suggest that the depletion allowance contemplated by the Congress and administered by the IRS extends only to a natural deposit or mineral property that has independent value and is exhausted by removal of the mineral itself. For example, Treas.Reg. § 1.611–2(a)(1) (1960) provides rules for computing cost depletion of "mines, oil and gas wells, and other natural deposits." The regulation states that a taxpayer is to calculate cost depletion of natural deposits by "multiplying the depletion unit . . . by the number of units of mineral sold." [10] Subsections (a)(3) and (c) refer to the number of units of mineral "remaining . . . to be recovered from the property" and to the "total recoverable units." Subsection (e)(4) defines the expected gross income of a mineral deposit as the "number of units of mineral recoverable in marketable form multiplied by the estimated market price per unit . . . ." The picture that emerges of the kinds of depletion deductions encompassed by § 611 simply does not include the situation in which a natural asset wastes in place, but appears limited to cases in which the asset is "recovered" or "extracted" and then, in the vast majority of cases, "sold." This is the same picture painted by the language of the Supreme

Court. Once again, no case has directly addressed the issue presented by the case at bar, and it may be that the Court's language is ill-considered and not properly generalizable to cover the universe of depletion deductions. Nevertheless the Court has repeatedly used the term "extraction" in the context of synoptic statements that purport, at least, to address the general concept of depletion. For example, in *Anderson v. Helvering, supra*, 310 U.S. 404, 408, 60 S.Ct. 952, 954, 84 L.Ed. 1277 the Court observed: "The deduction is therefore permitted as an act of grace and is intended as compensation for the capital assets consumed in the production of income through the severance of the minerals." In *Commissioner of Internal Revenue v. Southwest Exploration Co., supra*, 350 U.S. 308, 312, 76 S.Ct. 395, 397, 100 L.Ed. 347, the Court stated that the depletion deduction "is based on the theory that the extraction of minerals gradually exhausts the capital investment in the mineral deposit." In *Commissioner of Internal Revenue v. Brown, supra*, 380 U.S. 563, 576, 85 S.Ct. 1162, 1169, 14 L.Ed.2d 75, the Court characterized depletion as "a tax-free return of the capital consumed in the production of gross income through severance."

These statements, when taken together with the outline of depletion as delineated by the legislative history of the statute and the applicable treasury regulations, suggest that extraction or severance is bound up with the depletion deduction. The link seems certain to have been so self-evident to Congress and the Court that it has not heretofore been challenged or made explicit. Nevertheless our inquiry thus far, while instructive, cannot be said to have been conclusive.

It may be, for example, that the link between extraction and the depletion deduction is simply a happenstance, contingent on the manner in which industries depleted natural resources at the time the precursors to § 611 were taking shape. If this were the case, and extraction bore no functional relationship to the administra-

---

10. *But see United States v. Shurbet*, note 4 *supra*, 347 F.2d 103 (5th Cir. 1965).

tion of the depletion provisions, there might be reason to cast off the requirement of extraction when confronted by a non-extraction case that was nonetheless functionally identical to those for which Congress clearly intended the deduction.

On the other hand, it might be the case that extraction serves some function in the administration of the depletion provisions. In that case, we should credit the references to extraction in the cases and legislative history as more than casual remarks. Extraction would then be not merely contingently but conceptually bound up with the depletion deduction. What functional relation might extraction bear to the concept of depletion? In other words, how can the case at bar, in which peat subsides in place, be differentiated from a case in which a deduction would be allowed, such as when a taxpayer digs up the peat, bags it, and sells it as fertilizer?

## D. Extraction and Administrability

A fundamental tenet of our federal income tax system is the principle that before gain or loss is recognized there must be a taxable event. Whether a transfer of appreciated property pursuant to a property settlement agreement, *United States v. Davis*, 370 U.S. 65, 82 S.Ct. 1190, 8 L.Ed.2d 335 (1962), or the seizure by a foreign power of a corporation's foreign assets, *United States v. S.S. White Dental Mfg. Co.*, 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120 (1927), the common question is whether a taxable event has occurred. Mere fluctuation in value of assets owned by a taxpayer is not sufficient to allow recognition of loss or force recognition of gain. The sale of property, its destruction or its abandonment as worthless constitute evidence of losses or gains "which are fixed by identifiable events." *United States v. S.S. White Dental Mfg. Co., supra*, 274 U.S. at 401, 47 S.Ct. at 600.

No deduction is allowed in the former situations in part because there is no sufficiently observable, verifiable indicator that consistently provides sufficient information by which to recognize the value change for tax purposes. A deduction is allowed in the latter situations in part because the specified events provide such information.

In the case of the depletion deduction, extraction is precisely the kind of observable change accompanied by sufficient trustworthy information to make tax recognition appropriate. Unlike the case of depreciating an asset according to a fixed schedule, the depletion of a natural resource lends itself to false claims that a requirement of extraction helps prevent. This, then, is the function that Congress may have thought extraction would serve in the administration of the depletion deduction provisions. Given this functional relationship between extraction and the depletion deduction, the assumption apparently shared by Congress, the IRS, and the courts that depletion was designed for the extractive industries makes a good deal of sense. Without the frequent references in the legislative history and current regulations to extraction or severance, the existence of this functional relationship could not justify our holding. Without some functional relationship between extraction and depletion, one might be tempted to dismiss these references to extraction as careless remarks. Given both, however, the picture of the depletion deduction as bound up with extraction emerges with a rational aspect.

To be sure, in the case at bar the taxpayer presents us with a jury finding that its peat is subsiding at a determinate rate. But in many similar cases it will be difficult and will entail considerable administrative costs to the government to verify the rate by which an asset in place is being exhausted. Wind and water erosion cause irreplaceable soil losses in various parts of the country. In most cases, this is a consequence of cultivation like the depletion of Duda's peat soil. Moreover, the oxidation of organic matter occurs in all cultivated soils, albeit in different degrees and at different rates of subsidence, just as it occurs in Duda's peat. Finally, we might consider the case of a farmer who claims, justifiably, that if Duda is allowed a deduction for its peat, he ought to be allowed a depletion deduction for the exhaustion of the nu-

trients in his soil attributable to, say, cotton farming. There seems no reason why nutrients, which largely determine the fertility of a particular parcel of land, should not be considered natural deposits. Once the farmer crosses this threshold it will be an easy matter to show, in principle, that long term cultivation depletes the nutrients despite such short term devices as allowing the land to remain fallow. Although the farmer may purchase fertilizer to replace the nutrients, that is no different in principle from requiring Duda to replace its peat. The farmer may show all this in principle, but as a practical matter the administration of the depletion deduction in these sorts of cases raises whole new sets of difficulties.[11]

It may be that Congress intends to grant deductions in these cases. If so we must insist that it address itself specifically to the case of a natural asset wasting in place. The Code abounds in specifics and delights in the particular; in light of the significant functional difference between the case of an asset wasting in place and an asset that is depleted by extraction, and in light of the legislative history of § 611 and the pertinent treasury regulations, we decline to extend the general depletion provisions to the particular situation with which Duda confronts us.

## II. Depreciation

■ Section 167 of the Code authorizes as a depreciation deduction "a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) . . . of property used in the trade or business . . . ." The regulations promulgated under this section of the Code have long provided that the depreciation allowance "does not apply . . . to land apart from the improvements or physical developments added to it." This rule is currently expressed in Treas.Reg. § 1.167(a)–2 (1960). This court has recognized that land is not a depreciable asset for tax purposes. See, e. g., Houston Chronicle Publishing Co. v. United States, 481 F.2d 1240, 1258 (5th Cir. 1973), cert. denied, 414 U.S. 1129, 94 S.Ct. 867, 38 L.Ed.2d 754 (1974).

Duda denies that its peat soil is part of the land, however, and claims instead that the peat soil is an exhaustible capital asset separate from the underlying land. This claim is indeed curious. Duda uses the peat soil for farming, a more or less traditional use of "land." A passing traveler in an airplane or one on a nearby river would have little trouble terming Duda's peat soil "land." The workers who harvest Duda's crops are not bothered by such metaphysical quandaries—they know who owns the "land."[12] Duda nevertheless asserts that only the limestone marl substrata is land and that all those who suppose otherwise are deceived.

Duda's claim is predicated on the notion that land is not depreciable only because it is not subject to exhaustion.[13] The peat soil, on the other hand, is being exhausted and, hence, the usual rules cannot apply. Therefore, taxpayer reasons, the peat soil cannot be land. This argument is mistaken.

11. For example, should an industrial concern that owns a lake, uses its water in production, but gradually pollutes the lake be entitled to claim depletion deductions as it exhausts the supply of fresh water? Compare United States v. Shurbet, 347 F.2d 103 (5th Cir. 1965), which allowed farmers to take cost depletion deductions for water extracted from an underground reservoir (which was not replenished in equal amount by drainage or rainfall) and used to irrigate the farmers' land. The only significant difference between Shurbet and the polluter hypothetical is that in Shurbet the court carefully limited its holding to "the allowance of cost depletion for ground water extracted from the Ogallala water reservoir . . . ." [emphasis added]

12. The Florida courts would agree with Duda's workers. Under both Florida and common law, "the term 'land' embraces . . . the soil." Walters v. Sheffield, 75 Fla. 505, 511, 78 So. 539, 541 (1918).

13. If this were strictly true, the Commissioner need not have made clear that land was not depreciable since no land owner could ever claim a depreciation deduction. It is because there are colorable claims that one's land is depreciating that the Commissioner's rule becomes meaningful.

As we have already observed, all topsoil is subject to the oxidation of its organic constituents, to water and wind erosion, and other kinds of "wear and tear." A rancher whose cattle graze on natural grasslands is not allowed to depreciate his pasture.[14] In these cases, like the case at bar, the taxpayer makes no additions to or improvements on the land but seeks to depreciate the land itself. Even landscaping costs are not depreciable if the particular trees and shrubbery are "inextricably associated" with the land, although they are depreciable when associated with buildings or physical improvements to the land. *See, e. g., Trailmont Park, Inc. v. Commissioner,* 40 T.C.M. (P–H) ¶ 71,211, ¶ 71,212 (1971); Rev.Rul. 74–265, 1974–1 Cum.Bull. 56.[15]

Duda relies on *Sexton v. Commissioner,* 42 T.C. 1094 (1964), in which the court held that a taxpayer in the refuse business who purchased property for the purpose of using abandoned excavations on it as a dump site could depreciate the hole as it filled up. The notion that a hole is a depreciable asset is odd, but in any event the case does not help Duda. To begin with, the hole was not a natural configuration of the land but a physical development added to it (or more properly, subtracted from it). As the five dissenting judges in *Sexton* pointed out, if taxpayer had bought a tract of barren land with a natural ravine running through it, the property involved would have been classified as nondepreciable land. *Id.* at 1105. The instant case is in this respect like the latter hypothetical rather than *Sexton* itself. Moreover, the *Sexton* court empha-

sized that it was taxpayer's interest in the "space" thus created that constituted the depreciable asset "separate and apart from the related land." *Id.* at 1100. In the case at bar, the taxpayer's distinction between the marl substrata, which it concedes is land, and the topsoil, which it argues is not, is artificial and ultimately unpersuasive.

We hold that Duda is not entitled to either depletion or depreciation deductions for the subsidence of its peat soil. Insofar as the disappearance of the peat appreciably reduces the value of the remaining land, Duda will properly recognize any diminution in value upon its sale of the property. Accordingly, the judgment of the district court on this issue must be reversed.

## III. Cattle

### A. Facts

During the taxable years at issue and at all relevant times Duda maintained a brief cattle operation composed of two herds, a commercial herd and a purebred or Brahman herd. The purpose of the commercial herd is to raise cattle for sale as beef. The ostensible purpose of the purebred herd is systematically to improve the strain of Duda's commercial herd through cross-breeding. Cattle produced from the purebred herd are either retained for the purebred herd, put into the commercial herd to increase the quality of the beef operation, or sold.

Duda asserts that it decides which offspring of the purebred herd it will retain

---

**14.** Compare *Johnson v. Westover,* 48 A.F.T.R. 1671 (S.D.Cal., Mar. 21, 1955), where a court allowed a rancher to depreciate a permanent pasture used for grazing purposes. The court observed that the "200 acres of permanent pasture on the land . . . was not natural growth but was the type of pasture that is planted from seed . . . ." *Id.* at 1673.

**15.** This distinction appears founded on considerations of administrative convenience similar to those operative in the link between extraction and depletion. The difficulty is in computing a useful life for land. A useful life for land preparation will be considered established when it must be replaced contemporaneously with a related depreciable asset. *See* Rev.Rul.

72–96, 1972–1 Cum.Bull. 66. Thus, when landscaping consisting of perennial shrubbery and ornamental trees are immediately adjacent to apartment buildings so that replacement of the buildings will destroy the landscaping, the landscaping assumes the useful life of the buildings. But that portion of the landscaping that will be unaffected by replacing the apartment buildings, and hence will not be replaced contemporaneously with the buildings, is not a depreciable asset but is "inextricably associated with the land." Rev.Rul. 74–265, 1971–1 Cum.Bull. 56. This is true even though the shrubbery and ornamental trees planted far from the buildings, like Duda's peat soil, have theoretically a limited useful life.

and which it will cull according to objective criteria designed to select the most qualified breeding animals. For example, Duda weighs and grades each purebred calf at the end of four months, eight months, and again between fourteen and twenty months. Through its grading system Duda can determine prior to an animal's actually producing offspring whether it is of sufficiently high quality for use as a breeder in Duda's program to improve its herd. Any animal found wanting is sold either to another rancher for breeding purposes or directly to the slaughterhouse. So it goes.

Duda claims that until it culls certain cattle from its purebred herd, it holds them primarily for breeding purposes. All cattle in issue were between 12 and 36 months old when sold. Duda claims that all had been determined to be unqualified for breeding purposes in its purebred or commercial herds. Accordingly, taxpayer sought capital gains treatment on the sale of these cattle pursuant to § 1231 of the Code. The government contended that because Duda knows in advance that each year it will cull and sell some of its purebred animals, it holds those animals for sale to customers in the ordinary course of business. Accordingly, the government taxed Duda's gain on sale as ordinary income.

In Duda' tax refund suit below, the jury found by special verdict that Duda was not holding the purebred cattle in dispute primarily for breeding purposes. The court, however, granted Duda's motion for judgment notwithstanding the jury's verdict.

B. Evidence

The question whether Duda held the cattle primarily for breeding purposes or primarily for sale has factual underpinnings, but this ultimate issue is inherently a question of law. This court has so characterized the question whether a taxpayer's primary purpose was investment or sale with respect to real estate, *Biedenharn Realty Co., Inc. v. United States*, 526 F.2d 409, 416 n. 25 (5th Cir.) (en banc), *cert. denied*, 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976); *United States v. Winthrop*, 417 F.2d 905, 910

(5th Cir. 1969), and franchise rights, *Devine v. Commissioner of Internal Revenue*, 558 F.2d 807 (5th Cir. 1977), and we see no reason not to apply this principle to cattle as well. *But see Gotfredson v. Commissioner of Internal Revenue*, 217 F.2d 673, 677 (6th Cir. 1954); *McDonald v. Commissioner of Internal Revenue*, 214 F.2d 341 (2d Cir. 1954) (whether cattle held for breeding was question of fact).

■ Accordingly, our power to review the ultimate legal determination below is plenary and not limited by the clearly erroneous rule. *Biedenharn Realty Co., Inc. v. United States, supra*, 526 F.2d at 416 n. 25. By the same token, the usual standard of review regarding a judgment notwithstanding the jury's verdict, *see Boeing Co. v. Shipman*, 411 F.2d 365, 374–76 (5th Cir. 1969) (en banc), is inapposite with respect to this ultimate issue.

We begin by noting the case by case nature of our review. As we said in *United States v. Winthrop, supra*:

In analyzing a case of this sort no rubrics of decision or rubbings from the philosopher's stone separate the sellers garlanded with capital gains from those beflowered in the garden of ordinary income. Each case and its facts must be compared with the mandate of the statute. In so doing we note that the enunciations of the Supreme Court are clarion as they enjoin us to construe narrowly the definition of a capital asset and as a corollary interpret its definitional exclusions broadly.

417 F.2d at 911 (citations omitted).

■ In determining whether Duda held its purebred cattle primarily for sale, we shall consider the following factors: substantiality and frequency of sales, solicitation and advertising efforts, and the method by which the taxpayer differentiates between the cattle it sells and those it retains in its breeding herd.

Evidence at trial showed that purebred cattle are not bred into the Brahman herd until they are 20 months old, that the taxpayer extensively advertised purebred cat-

tle for sale, that taxpayer annually sold up to half of the calves produced from the purebred herd, and that taxpayer would occasionally sell for breeding purposes animals that qualified for taxpayer's own breeding herd if it had available other suitable animals.

There can be little dispute that Duda's substantial sales and extensive advertising efforts weigh against Duda's claim that it held purebred cattle primarily for breeding purposes. Taxpayer was continually making sales of young animals, some of which were sold *in utero*. Its sales approximated half of its annual calf crop. Taxpayer regularly advertised its cattle in various livestock publications. For example, one advertisement read as follows:

> Visit our ranch and see our cattle. No matter what your Brahman requirements, we can supply just the right animal to fit your situation.

The third and most important factor—Duda's criteria for deciding which animals to retain—is more problematic. When the number or age of animals culled from a breeding herd depends entirely on the desires of prospective purchasers, it is clear that the animals are held primarily for sale in the ordinary course of business. *See Fox v. Commissioner of Internal Revenue*, 198 F.2d 719 (4th Cir. 1952). When a taxpayer culls and sells animals from a breeding herd solely because they do not measure up to the high standards of the herd, this suggests that he holds the animals primarily for breeding purposes. *McDonald v. Commissioner of Internal Revenue, supra*, 214 F.2d at 343.

We shall consider first Duda's criteria for determining the age at which to sell purebred cattle. Many of the cattle Duda sold were too young to have been bred into the breeding herd. The government points out that Duda sold largely to South American ranchers who desired younger and lighter calves for their reduced shipping weight. This suggests one possible motive for Duda's selling young animals that would weigh against capital gains treatment. It is more than counterbalanced, however, by other considerations. Duda had an independent interest in selling young animals, thereby saving on feed and storage costs, as long as by selling young animals it was not sacrificing superior breeders. Although one cannot be certain whether an animal is superior until it is actually bred, Duda's selling some animals before they could be bred is consistent with capital gains treatment if Duda was able to distinguish superior from inferior breeders without breeding them.

In short, that Duda sold cattle before they were bred into the Brahman herd cannot independently preclude its receiving capital gains treatment. Treas.Reg. § 1.1231–2(b)(1) provides that a breeding purpose may exist even when a taxpayer disposes of an animal "within a reasonable time after its intended use is prevented or made undesirable by reason of . . . unfitness of the animal for such purpose . . . ." The evidence showed that Duda segregated all purebred cattle before they were either sold or bred into the herd and afforded each special treatment as potential breeding stock. Duda possessed the expertise to cull as unfit for its own purebred herd certain cattle at a relatively early stage, prior to observing the results obtained from actually breeding them. Consequently, it would be unfair to penalize Duda for its skill in detecting and culling inferior animals at an early stage.

■ If the superiority of an animal had been the only criteria Duda used to decide which cattle to retain, we would agree that Duda might be holding the animals primarily to improve its breeding herd. Consequently we reject the government's contention, that the taxpayer's ability to predict that it would sell many of its breeding cattle each year alone justifies the inference that Duda held the cattle for sale. We agree with the Second Circuit that such a rule

> penalizes breeders with skill sufficient to detect and cull inferior animals even before they have been bred. True, an affirmative judgment that an animal is superlative cannot be made without examination of its offspring. But the evidence

is compelling that a negative judgment can often be made on the basis of . . [various objective criteria]. Thus younger animals can be accurately culled, and the animals which the taxpayer sold were selected in this manner. Before an animal had been thus weeded out it was part of the regular herd, held for dairy and breeding purposes until it should prove unfit. . . .

Of course it was the taxpayer's contemplation that many or most of the animals would be found wanting and be sold. The operations might perhaps even have proved unfeasible without the income thus derived. And in a very real sense the taxpayer could have said at any moment that most of his calves were held for possible sale. But this was not the motive behind their retention, and legislative history of the new law [the predecessor to § 1231(b)(3)(B)] shows that motive is to be controlling.

McDonald v. Commissioner of Internal Revenue, 214 F.2d 341, 343 (2d Cir. 1954). But see Gotfredson v. Commissionner of Internal Revenue, 217 F.2d 673 (6th Cir. 1954); Fox v. Commissioner of Internal Revenue, 198 F.2d 719 (4th Cir. 1952).

In the case at bar, however, the jury had additional evidence. It knew not merely that Duda sold purebred cattle that were unfit for its breeding herd, but also that Duda would sell purebred cattle that were perfectly fit for its breeding herd. See Record on Appeal at 196. In other words, Duda had an additional criterion regarding which cattle to retain and which to sell. The inferiority for breeding purposes of a given animal was a sufficient but not a necessary condition of Duda' selling it. If the animal was a superior breeder, Duda had other superior breeders, and a customer wished to buy it, Duda would sell. Thus the additional criterion regarding the sale or retention of a superior animal was customer demand. This distinguishes the instant case from McDonald, supra. It cannot be said of Duda, as the McDonald court said of the taxpayer in that case, that it "initially retained all of the cattle here involved with the hope that they would meas-

ure up to [its] high standard." Duda knew from the outset that if all cattle met its high standard, it would still try to sell some of those excellent breeders.

In light of Duda's substantial sales, extensive advertising, and responsiveness to customer demand, we think the jury correctly found that Duda's primary motive was to hold the cattle for sale. Accordingly, the order of the district court granting Duda's motion for judgment notwithstanding the jury's verdict is reversed and the cause remanded to the district court with instructions to reinstate the jury's verdict.

IV. Conclusion

In pronouncing our benediction denying legislative grace upon Duda's subsiding soil, we hope we have not been insensitive to Duda's invocation of its legal rights. The taxpayer invoked the blessings of the Code with spiritual vigor, but we find nothing in its revelations to convince us that Duda is entitled to the dispensations for which it prayed.

Depletion and depreciation are blessings granted or withheld from taxpayers based upon the Code and its regulations. Neither source of law is a paragon of consistency, logic or equity. Taxation is practical and pragmatic, not always pure and perfect in its exactions.

Had we reached a different result in this ruckus over peat and muck, we are confident our decision would have underlain many strata of future decisions with respect to depletion or depreciation of land and its constituents. The ingenuity of the tax mind is boundless and it does not recede or subside with the passing years. Granting depletion or depreciation could easily be extrapolated by these ingenuities into situations that the most informed imaginations of today cannot contemplate. Congress is fertile of imagination and prolific of pen, and if it desires to afford depletion deductions for a non-extractive enterprise, it will do so. In light of the legislative history of § 611 and the regulations promulgated thereunder, we do not think it has yet done so.

With respect to the cattle issue, the evidence justified the jury's finding that Duda was not pure in its breeding motivations. Duda pastured its cattle with a mixed breed of motives, and in light of Duda's sales of as much as half of its annual calf crop, extensive advertising, and its willingness to sell animals that it would otherwise have used for breeding, we think the jury's verdict was correct. Accordingly, Duda may not be "garlanded with capital gains," but must lie down in the plain pastures of ordinary income. *United States v. Winthrop*, 417 F.2d 905, 911 (5th Cir. 1969).

The judgment of the district court regarding both issues is reversed and the cause remanded for proceedings not inconsistent with this opinion.

REVERSED and REMANDED.